**Laurie W. TOMLINSON, District Director of Internal Revenue for the District of Florida, Appellant,**

**v.**

**W. M. MILES and Edith P. Miles, his wife, H. E. Pontius and Lovina B. Pontius, his wife, and Ralph A. Marsicano and Marie B. Marsicano, his wife, Appellees.**

**No. 19323.**

United States Court of Appeals Fifth Circuit.

April 29, 1963.

Rehearing Denied May 27, 1963.

---

George W. Ericksen, Chester H. Ferguson, Tampa, Fla., Stanley W. Rosenkranz, of Macfarlane, Ferguson, Allison & Kelly, Tampa, Fla., for appellees.

Before TUTTLE, Chief Judge, and JONES and GEWIN, Circuit Judges.

TUTTLE, Chief Judge.

 This is an appeal by the District Director of Internal Revenue from an adverse judgment which permitted the appellee-taxpayers to recover taxes which they had paid as transferees of their corporation, Milspinmar Corporation. The action, therefore, deals with the question whether the corporation was subject to the income taxes representing the gain on the sales of property for the years 1950, 51, 52 and 53.

The facts are not essentially in dispute. In 1946, four individuals, the above named husbands together with an unmarried associate, Louis Spiner, desired to buy some land from a local Drainage District, the purchase price being $9800. This amount was paid by each of them giving his check for $2500, less $200 which Marsicano gave for the purpose of "paying for title insurance, some recording fees and little incidental expenses." Before the deed was received, Milspinmar Corporation was formed. The purpose for the forming of the corporation can be taken to be that asserted by the appellees in their brief as quoted from the language of Marsicano, the lawyer, as follows:

> "We arrived at the conclusion of what was the best way to take the title so that the seven beneficial owners would not be hampered with a multiplicity of signatures and a lot of complexities in the event we sold the property." "* * * the thing that I was concerned with was trying to get seven people owning a piece of property together; to try to get them all together to sign a contract or a deed or something like that, is really a problem."

Louis F. Oberdorfer, Asst. Atty. Gen., Alec A. Pandaleon, Lee A. Jackson, Robert N. Anderson, Bernard J. Schoneberg, Attys., Dept. of Justice, Washington, D. C., Edward F. Boardman, U. S. Atty., Miami, Fla., Don M. Stichter, Asst. U. S. Atty., Tampa, Fla., for appellant.

The corporate formalities were completed on August 19, 1946. On September 5th

the first and only formal meeting of the Board of Directors was held. At this time the following Resolution was adopted:

"WHEREAS, W. M. Miles, Edith P. Miles, Louis H. Spiner, Ralph A. Marsicano, Marie Brinker Marsicano, H. E. Pontius and Lovina B. Pontius, have agreed with and paid to the Southwest Tampa Storm Sewer Drainage District, a corporation organized and existing under the Laws of the State of Florida, situate in Hillsborough County, Florida the amount of Nine thousand eight hundred ($9,800.00) Dollars, as full consideration for the purchase price of the following described property situate in Hillsborough County, Florida, to-wit:

[Legal description omitted]

"said property to be owned by the said parties in the respective interest to-wit: W. M. Miles ⅛; Edith P. Miles ⅛; Louis H. Spiner ¼; Ralph A. Marsicano ⅛; Marie Brinker Marsicano ⅛; H. E. Pontius ⅛; and Lovina B. Pontius ⅛, and,

"WHEREAS, the said purchasers desire to have the title to said property conveyed to Milspinmar Corporation for the use and benefit of said purchasers in order to facilitate the payment of ad valorem and drainage district taxes and to expedite the conveyance of all or any part of said property as the same may be sold, Now, Therefore,

"BE IT RESOLVED BY THE BOARD OF DIRECTORS OF MILSPINMAR CORPORATION:

"(a) That the above described property shall be conveyed by the said Southwest Tampa Storm Sewer Drainage District, a corporation, to Milspinmar Corporation, and the deed or deeds conveying said property shall be accepted and the title held by Milspinmar Corporation for the use and benefit of the aforesaid beneficial owners according to the interests set forth, for the purpose of facilitating the payment of taxes and to expedite the conveyance of any or all of said property.

"(b) That the Corporation shall convey by good and sufficient deed, all or any part of the above described property to such grantees as the said beneficial owners above named may from time to time designate.

"(c) That the Secretary of this Corporation shall issue to each of the aforementioned beneficial owners, a certified copy of this Resolution as evidence of their ownership and interest in the above described property."

Thereupon the deed was received from the Drainage District and filed for record.

The Minutes of the September 5th meeting also show the following:

"The Secretary and Treasurer announced that he had on hand the amount of $1,000.00 in full payment of all of the capital stock of the Corporation, and that such amount represented the amount of capital with which the Corporation would begin business.

"Upon motion duly made, seconded and unanimously carried the Secretary and Treasurer was directed to deposit the full amount of said capital of the Corporation in the name of the Corporation at the new State Bank of West Tampa, Tampa, Florida, which would open on November 1, 1946, and that checks would be drawn on said account in the name of the Corporation when signed by the Secretary-Treasurer and counter-signed by anyone of the other officers."

It appears that Mr. Marsicano advanced the $1000 with which the bank account was opened. This money was used to pay outstanding ad valorem and Drainage District Assessments. Subsequently, on November 1st and December 12th, 1946, the corporation received $533.30 representing the proceeds from the sale

of timber off the lands. This money was also used to pay the taxes and drainage assessments, which, as it was stated, were a little more than $1500.

In 1947, Spiner wished to get his part of the property out and the parties reached an agreement with respect to the portion to be parceled to Spiner. He received a part of the land and gave his deed to the other stockholders and transferred his stock in the corporation to the other stockholders as well. Spiner also received an assignment of a purchase money mortgage representing his share of such assets then held in the corporation's name.

The corporation sold off pieces of its real estate in seven separate transactions, in one of which it repurchased a piece of land it had sold to one Bidwell in 1948.[1] Also the corporation executed assignments, satisfactions and partial releases of mortgages which were secured as partial payment when the sales were made.

We think it clear that without dispute these individuals elected for purposes of their own to cause title of this property to be placed in the corporate name, and for it to be dealt with for their benefit in such manner as it would have to be dealt with so long as the corporation appeared to be the record title holder of the property. The benefits of such an arrangement are obvious. In the first place, no dower rights would attach to the wives of the three married parties to the transaction. In the second place, in the event of the death of any member of the group no administration would be necessary in order to clear the title to the real estate. In the third place, sales could be made by an execution of an instrument signed by officers of the cor-

poration rather than requiring seven signatures initially, or six signatures after Spiner got out. Also, any other documents necessary in completing transactions dealing with the sale of property, such as the releasing of mortgages on the property, the cancellation of security instruments when full payment was completed, the execution of contracts for sale all would be facilitated. Finally, by the maintenance of a corporate bank account in which all funds were initially deposited, current payments of taxes, fees and the like could be made and all the excess could be immediately paid out to the individuals.

The taxpayers contend that the effect of this arrangement was to create the corporation as a naked trustee of title for the taxpayers who were the beneficial owners and, under the Florida law of trusts, also the legal owners of the property. The Government, on the contrary, contends that, having elected to have the transaction handled in corporate form, the corporation may not be excused from reporting the transactions resulting in a profit as its own profit, and paying taxes on this income entirely separately from the tax obligations of the individual taxpayers who were really stockholders of the corporation. The answer to this question is to be found by placing the facts of this case against the formula announced by the United States Supreme Court in Moline Properties v. Commissioner of Internal Revenue, 319 U.S. 436, at page 438, 63 S.Ct. 1132, at page 1133, 87 L.Ed. 1499, where, the Court said:

"The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state

---

1. While we use the language in the sense that the corporation did these things, we recognize that the appellees strongly urge that the corporation did none of them but that they were actually done by the stockholders of the corporation, the taxpayers here. We mean to indicate by the language used merely that, with title in the corporation, the documents were executed in the name of the corpo-

ration and security instruments were received in the name of the corporation, proceeds were placed in the corporation's bank accounts and checks were issued in the name of the corporation. These activities engaged in the name of the corporation were actually carried out by persons named as officers of the corporation.

of incorporation (citing cases) or to avoid (citing cases) or to comply with (citing cases) the demands of creditors or to serve the creator's personal or undisclosed convenience, (citing cases) *so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.* New Colonial [Ice] Co. v. Helvering, 292 U.S. 435, 442 [54 S.Ct. 788, 78 L.Ed. 1348]; Deputy v. duPont, 308 U.S. 488, 494 [60 S.Ct. 363, 84 L.Ed. 416]." (Emphasis added.)

On the surface of it there would hardly seem to be any doubt but that this corporation had the purpose "to serve the creator's personal or undisclosed convenience" and that this was "followed by the carrying on of business of the corporation." The taxpayers take the position that the mere carrying on of business by the corporation, to satisfy this requirement of the Moline Properties case, must be business relating to property to which it has title, either legal or equitable. They contend that this corporation was the holder of a mere naked record title with neither legal nor equitable ownership of the property and that therefore such business as was carried on by the corporation does not fall within the formula that is above set out. We find no such limitation in the formula adopted by the Supreme Court in the Moline Properties case. That no such limitation is intended is made clear by the Court's subsequent opinion in National Carbide Corporation v. Commissioner of Internal Revenue, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779. The Court there expressly called attention to its holding in the Moline Properties case, notwithstanding the findings of the Tax Court that *full beneficial ownership* of the property there involved was in the sole stockholder. The Court said:

"Undoubtedly the great majority of corporations owned by sole stockholders are 'dummies' in the sense that their policies and day-to-day activities are determined not as decisions of the corporation but by their owners acting individually. * * * We reversed the Board of Tax Appeals in Moline Properties *in the face of its findings that 'Full beneficial ownership was in Thompson [the sole stockholder] who continued to manage and regard the property as his own individually.'* " (Emphasis added.)

While it is true, of course, that it is highly unlikely that in any two situations the activities and conduct in the name of the corporation will be the same, we think it cannot be gainsaid that what was done by Milspinmar Corporation in the acquisition and recording of title to the land in question, the surveying of the land, the paying of taxes on it, the searching of titles, the sale of timber from it, the negotiation of contracts for its sale in different parcels, its actual sale, its receipt of purchase money security deeds, its release of these security deeds and its satisfaction of these deeds of record, together with the other activities naturally flowing from these transactions, such as the reacquisition of a tract from one purchaser, the acquisition of an additional tract in order to clear title, are the "equivalent of business activity," and amount to "the carrying on of business by the corporation." There can be no doubt but that the parties, when they initiated the corporate setup, had the purpose that these activities would be carried on and it is equally certain that they were actually carried on, thus meeting both of the alternative requirements quoted above from the Moline Properties case.

Taxpayers complain particularly of the lack of consistency on the part of the Commissioner of Internal Revenue in acquiescing in Moro Realty Holding Company, 25 B.T.A. 1135 and contesting the present case. The taxpayers also rely strongly on several Tax Court decisions, typical of which is K. C. Land Co., Inc., 19 T.C.M. 183. It goes without saying that where the Supreme Court has clearly established legal principles in dealing

with the subject matter in litigation, we look to these principles for guidance. They are controlling on us. Particularly in light of the gloss which National Carbide Corporation v. Commissioner, supra, has placed on the Moline Properties, Inc. case, we are unable to agree with the taxpayers here that their activities do not fall within the language of the formulation set down by the Supreme Court in the Moline Properties case.

The judgment of the trial court, finding that the corporate taxpayers owed no obligation for its own income taxes, was error. The judgment is, therefore, reversed and the case is remanded to the District Court for further proceedings not inconsistent with this opinion.