**HARRISON PROPERTY MANAGE-
MENT CO., INC., et al.**

v.

**The UNITED STATES.**

**No. 280–69.**

United States Court of Claims.

March 16, 1973.

C. Ellis Henican, New Orleans, La., of record, for plaintiffs; Henican, James & Cleveland, New Orleans, La., of counsel.

Thomas Smidt II, Arlington, Va., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant; Gilbert E. Andrews, Joseph Kovner, and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## OPINION

DAVIS, Judge, delivered the opinion of the court: *

█ The central issue turns on whether profits in the tax years 1960–63 derived principally from oil leases to property, the record title to which is in the name of a management corporation, are properly taxable to the corporation, as the defendant maintains or, as the plaintiffs contend, they are taxable solely to the individuals who, while retaining beneficial ownership of the property, transferred title to the corporation of which they were the sole incorporators, stockholders, officers, and directors. A subordinate issue is whether minor amounts paid by such corporation to two of its three shareholders as wages are properly classified as wages and are taxable accordingly under the Federal Insurance Contribution Act. The Government prevails on both issues.

Walter J. Harrison, William H. Harrison, and Mrs. Lydia Harrison Couturie Ryan, brothers and sister, owned extensive oil-bearing acreage and a headquarters building in Louisiana which, prior to April 14, 1960, they had operated through Crescent Commercial Company, their family partnership. On April 14, 1960, the three individuals formed the plaintiff corporation, Harrison Property Management Co., Inc., to which they transferred title to the property in question, without warranty or consideration, reserving to themselves beneficial title to the property and all rights to proceeds of existing leases thereon for mineral rights and rights-of-way. The corporation replaced the partnership, and was formed primarily for the stated purpose of providing for efficient management in the event of the death of one of the individuals. There is no hint that tax evasion or avoidance motivated the transaction.

The corporate charter tightly limited the rights, power, and authority of the corporation to conduct its business with particular reference to such transactions as acquisition of real property, investment of funds, fixing of officers' salaries, employment of personnel, adoption or repeal of by-laws, borrowing or lending of money, and sale or encumbrance of property, all of which transactions required unanimous approval of the shareholder directors. The transferors, who were the incorporators and became the sole stockholders of the corporation in equal proportions, as well as its sole officers and directors, retained full control of corporate decisions as to the matters specified. The charter required approval of a majority of the directors for the granting of leases, rights-of-way, licenses, or permits regarding the property transferred to the corporation "for administration and management purposes", and prohibited transfers of such rights so as to favor one officer or shareholder over another, directly or indirectly.

Contemporaneously with the incorporation the individuals and the corporation entered into an agreement which

---

* We borrow our statement of facts from the opinion of Trial Commissioner C. Murray Bernhardt but we come to the opposite conclusion on the principal question.

specified that the transfer of property to the corporation was made "solely and only as a matter of convenience and accommodation and without consideration whatsoever" having been paid by the corporation to the individuals, who were expressly identified as the "beneficial owners" and "true owners" of the property transferred, with the corporation disclaiming "any right, title, or interest" in and to the property other than the right to manage and administer it. By the agreement the corporation's expenses were to be charged against the three individuals in equal amounts by means of deductions from proceeds of operations distributable periodically to the individuals. The agreement also provided for the retransfer without consideration of any part of the corporate property to the individuals on a proportionate basis, required the corporation in the event of its breach of the agreement to retransfer all of the property proportionately to the individuals without consideration on due notice and demand by them, and required the retransfer of the property to the individuals after 50 years.

Throughout the taxable years in issue the corporation complied in all respects with the agreement's terms. It deducted from corporate revenues all expenses and credited the balance in proportionate amounts to accounts of the individuals, who received such earnings directly. The individuals were obligated to replenish the corporation's funds for costs and expenses, as needed, again on a proportionate basis. Besides payments for leases (the major source of income), receipts included cash contributions from shareholders, building demolition proceeds, profits from land sales, camp rentals, and pecan sale proceeds. Disbursements included salaries, payments to shareholders, taxes, cost of litigation and professional services, supplies, travel expenses, utilities, maintenance costs, commissions, insurance premiums, land care expense, contributions, and petty cash. The corporation maintained a checking account and recorded all receipts and disbursements on its books and records. No loans were made by or to the corporation.

The members at the first meeting of the board of directors of the corporation on April 15, 1960, specified that it was to be regarded purely as a "management instrument only" without change from the Crescent Commercial Company partnership which it succeeded, and stated the purpose of forming the corporation to be "solely to provide for efficient management in the event of the death of one of the Harrisons."

Each of the incorporators contributed $5,000 to the authorized capital of $15,000, and received in exchange 50 of the 150 authorized and issued shares of capital stock. The corporation and the individuals joined in suits. Some leases were signed by the corporation alone and some by it and the individuals. The corporate accounts reflected the three individuals as joint owners of the properties whose nominal title had vested in the corporation. The company maintained capital accounts in the names of the three individuals and generally speaking kept its financial and accounting records in much the same way as Crescent Commercial Company, the family partnership which it succeeded.

For calendar year 1960 the corporation filed a United States Fiduciary Income Tax Return on Form 1041, showing a distribution of net income proportionately to the three individuals. In 1961, 1962 and 1963 the corporation filed returns on Form 1120, reporting no income or expenses but accompanying each return with a schedule showing the proportionate distribution of income and expenses to the three individuals. In each of the calendar years 1960 through 1963 the individual plaintiffs filed separate Federal tax returns reporting the income and expenses allocated to them by the corporation. The taxes were paid accordingly. On February 9, 1968, the Internal Revenue Service made timely assessments of taxes and interest against the corporation as shown in the findings. The assessments against the corporation were paid by the three indi-

vidual plaintiffs on a proportionate basis. Claims for refund were duly filed by the corporation, and disallowed on March 28, 1969, resulting in this suit.

On the major issue of whether the management corporation is itself taxable on its income, there are well-established standards which confine and guide our ruling. The Supreme Court has spoken twice, in Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943), and National Carbide Corp. v. Commissioner, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949). The precedents in this court are Carver v. United States, 412 F.2d 233, 188 Ct. Cl. 202 (1969), and Love v. United States, 119 Ct.Cl. 384, 96 F.Supp. 919 (1951). A leading case in the courts of appeals is Tomlinson v. Miles, 316 F.2d 710 (C.A. 5), cert. denied, 375 U.S. 828, 84 S.Ct. 71, 11 L.Ed.2d 60 (1963). Under the principles declared and applied in those decisions, it is very clear that —putting aside for the moment the contract (which plaintiffs call an agreement of agency) made by the individuals with the corporation at the time it was set up —the corporation was taxable.

██ ██ The paramount principle is that stockholders of a closely held corporation cannot demand (Subchapter S aside) that it be ignored for federal income tax purposes—at least if it is more than a pure sham and was created or acts for some business end. "The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity." Moline Properties, Inc. v. Commissioner, supra, 319 U.S. at 438–439, 63 S.Ct. at 1134 (footnotes omitted). Where individuals adopt the corporate form for purposes of their own, the choice of the advantages of in-

corporation to do business requires "the acceptance of the tax disadvantages." Ibid. It is immaterial that the shareholders remain the beneficial owners of the property transferred to the company, or that the latter's policies and day-to-day activities are determined, not as decisions of the corporation, but by the owners acting individually. National Carbide Corp. v. Commissioner, supra, 336 U.S. at 433–434, 69 S.Ct. 71; Tomlinson v. Miles, supra, 316 F.2d at 714; Carver v. United States, supra, 412 F.2d at 239, 188 Ct.Cl. at 212–213. By the same token, it does not matter that the corporation is regarded by its owners as a simple "dummy". National Carbide Corp. v. Commissioner, supra, 336 U.S. at 433, 69 S.Ct. 726; Love v. United States, supra, 96 F.Supp. at 922, 119 Ct.Cl. at 405. The controlling tests, ignoring the fact that the corporation is substantially the alter ego of the stockholders, concentrate on the reasons why the "dummy" was created, and what it actually does.

Harrison Property Management Co. Inc. was formed for the three Harrisons' own "convenience", in that its primary purpose was to provide for efficient management if one of them died, and a lesser aim apparently was to decrease the need for the signatures of all three owners in routine operations. Those are, of course, business goals—perfectly acceptable business purposes—deliberately sought by the Harrisons for their own ease and advantage. Other benefits of the corporate form would also accrue to the shareholders, as the Fifth Circuit pointed out in the similar case of Tomlinson v. Miles, supra, 316 F.2d at 713.

Moreover, this corporation was actually used, and performed business functions. It authorized and executed leases for mineral rights, granted several rights-of-way, sold some produce, acted as a party in litigation, hired executive officers, paid local taxes, maintained its building, kept a checking account, recorded its receipts and disbursements, held meetings of stockholders and directors, and followed the formalities of cor-

porate operation. It was by no means dormant or inert. On the contrary, its business activity was fully comparable to that found in Tomlinson v. Miles, *supra*, and more than in *Carver*—both of which held the corporation a taxable entity.[1] We know of no case which, on similar facts, has disregarded the corporation, at the instance of the shareholders, as not engaging in enough business activity. In Paymer v. Commissioner, 150 F.2d 334 (C.A. 2, 1945), the court of appeals upheld the taxability of one corporation which carried on somewhat less activity than Harrison Property Management Co., Inc., but disregarded as sham a sister company which did nothing but take and hold title to some real estate as a blind to deter the creditors of one of the shareholders.

Plaintiffs, however, do not put their major emphasis on the status of the corporation apart from the side agreement. Fundamentally, they rest on this contract between the Harrisons and the Management Company which, in their view, brings this case within the exception recognized by the Supreme Court in National Carbide Corp. v. Commissioner, *supra*, 336 U.S. at 437, 69 S.Ct. at 734: "What we have said does not foreclose a true corporate agent or trustee from handling the property and income of its owner-principal without being taxable therefor." The claim is that by this pact, made contemporaneously with the birth of the corporation, the company was made, and continued to act as, such a "true corporate agent."

 *National Carbide* makes it clear that the formal designation of "agency agreement" is not conclusive; the significant criteria, as we understand them,

are whether the so-called "agent" would have made the agreement if the so-called "principals" were not its owners, and conversely whether the "principals" would have undertaken the arrangement if the "agent" were not their corporate creature. The Court put it thus: "If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal * * *" (336 U.S. at 437, 69 S.Ct. at 734), and the opinion illustrated that premise by saying of the corporate parent in that case (Airco, the alleged "principal"): "The entire earnings of petitioners [Airco's subsidiaries, the alleged "agents"], except for trifling amounts, are turned over to Airco not because the latter could command this income if petitioners were owned by third persons, but because it owns, and thus completely dominates the subsidiaries. Airco, for sufficient reasons of its own, wished to avoid the burdens of principalship. * * * It cannot now escape the tax consequences of that choice, no matter how bona fide its motives or longstanding its arrangements. When we referred to the 'usual incidents of an agency relationship' in the *Moline Properties* case, we meant just that—not the identity of ownership and control disclosed by the facts of this case" (336 U.S. at 438–439, 69 S.Ct. at 734–735).

An example of a "true" agency (or "true" trusteeship) under this standard was found by this court in Carver v. United States, *supra*, 412 F.2d at 239–240, 188 Ct.Cl. at 213–214, where the wholly-owned corporation acted on behalf of a non-owner independent third-party in the same way as it did for its individual owner. The relationship to

1. There is a dispute whether the corporation had valid record title, under the peculiarities of Louisiana law, to the property transferred to it. We are not impressed with plaintiffs' state law argument that it did not—a current contention which is at war with the consistent conduct of the company's business on the understanding that it did have record title (including a statement to that effect in the side agreement between the company and

its owners). Furthermore, in Carver v. United States, *supra*, 412 F.2d at 238, 239, 188 Ct.Cl. at 210–211, 212–213, this court expressly held taxable a corporation which was assumed not to have legal or equitable title, under the intricacies of state law, to the property transferred to it by its stockholders. *See also* National Carbide Corp. v. Commissioner, *supra*, 336 U.S. at 434–435, 438, 69 S.Ct. 726.

this third-party, an outsider, demonstrated that, with respect to that transaction, the company's agency connection with its owner was not dependent on the fact of ownership.

Unlike this aspect of *Carver*, we do not doubt that the present plaintiffs fail the test. It is inconceivable that Harrison Property Management Co., Inc. would have made its alleged "agency" contract with property owners other than its own shareholders, the Harrisons, or that the latter would have agreed to such an arrangement with the corporation if they did not own and control it. Obviously the agreement was deliberately drawn, in conjunction with the special provisions of the corporate charter, so that the company would service its owners alone, and was made solely because they were its owners. The entire operating arrangement was custom-made for that very purpose. The total arrangement assured, for instance, that each of the three Harrisons (or a representative) would be one of the three directors of the corporation; that sales of property would have to have the approval of all three but that two would be enough for future leases; that certain activities (including acquisition of land and making investments) would also require the unanimous consent of all three; that expenses were to be charged equally against the three; and that the property transferred to the corporation would be transferred (before the end of the corporate life in 50 years) only if all three should so demand (except in case of breach by the company or failure to manage part of the property). Thus, many of the important activities of the company required consent of all three Harrisons (or their designees), while the rest called for ap-

proval of two of them. In other words, all of the corporation's relations with the beneficial owners of the managed property were wholly dependent on the fact that they were the sole shareholders.

Several of the points made to support a "true agency" here seem to assume that the *Moline Properties-National Carbide-Love-Tomlinson-Carver* rule for the taxability of close corporations, discussed earlier in this opinion, can be avoided by the simple device of having the company and its owners execute an "agreement" designating the former as "agent" and the latter as "principal", regardless of the actual relationships and the realistic operations of the corporation. We have already pointed out that the *National Carbide* opinion, which rejected such an agreement (comparable to the one we have before us) as establishing a "true agency", squarely disposes of that postulate, and on the contrary calls for a more substantial showing that the connection between the self-designated "principal" and "agent" is independent of the "principal's" ownership of and control over the "agent".[2]

*National Carbide* also answers other contentions raised on behalf of plaintiffs. One is that the "principals" (here, the Harrisons) received all the profits directly. As to this, the Supreme Court said (336 U.S. at 436, 69 S.Ct. at 733):

The Tax Court felt that the fact that Airco [the "principal" and owner in that case] was entitled to the profits by contract shows that the income "belonged to Airco" and should not, for that reason, be taxed to petitioners [the "agents", wholly-owned corporations]. Our decisions requiring

2. Plaintiffs seem to argue that when the Supreme Court said, "If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal", the Court implied that the formal existence of a bare "agency agreement" would show *ipso facto* that these relations were not, and could not be, "dependent" upon own-

ership (as they would be in the absence of some paper contract), but rather upon the technical wording of the agreement (regardless of its content and operation). The whole of the last section of the *National Carbide* opinion, 336 U.S. at 437–439, 69 S.Ct. 726, with its analysis of the "agency agreement" in that case, refutes this semantic suggestion.

that income be taxed to those who earn it, despite anticipatory agreements designed to prevent vesting of the income in the earners, foreclose this result. [Citing cases]. Of course one of the duties of a collection agent is to transmit the money he receives to his principal according to their agreement. But the fact that petitioners were required by contract to turn over the money received by them to Airco, after deducting expenses and nominal profits, is no sure indication that they were mere collection agents. Such an agreement is entirely consistent with the corporation-sole stockholder relationship whether or not any agency exists, and with other relationships as well.

Another circumstance negatived by the *National Carbide* opinion as showing "true agency" is that the "agent's" assets all came from the owner-"principal", without real consideration in return. 336 U.S. at 434–435, 438, 69 S.Ct. 726. The Court thought it irrelevant on the agency issue whether the funds supplied by the owner were capital contributions or loans; in either case the parent was not a true principal. Similarly in our case the fact that the Harrisons supplied the Management Company's assets and its operating capital is ineffective to create a "true agency".

In *National Carbide* the purported "agents" (subsidiary corporations) carried on more extensive activities than Property Management did here but each of those subsidiaries was limited in its functioning (336 U.S. at 424–425, 69 S. Ct. 726), just as the Harrisons' company was restricted to the management of certain real estate. In neither instance was the "agent" permitted to perform all the functions of the "principal". And we have held in the first part of this opinion that the limited activity carried on by Harrison Property Management, which clearly resulted in income from leasing and otherwise, was enough for taxability under the *Moline Properties* principle.[3]

We close on this issue by noting that it is especially important to adhere to the *National Carbide* tests in cases, such as this, of closely-held small corporations. In Subchapter S, sections 1371–1379 of the 1954 Code, Congress has provided, in defined circumstances, for the treatment of such companies as partnerships, with the stockholders rather than the corporation paying the income tax on the profits. It appears highly probable that Harrison Property Management Company, though a small business corporation, could not qualify for Subchapter S benefits because more than 20 percent of its receipts in the taxable years was "passive investment income" from rents—a specific exception contained in Section 1372(e)(5). This limitation is still an integral part of the Congressional design for lifting the tax from the corporation [4]—an existing legislative restriction which would be thwarted if non-eligible companies could attain the same result by the simple procedure of a surfacial "principal"-

3. In addition, it is noteworthy that the agreement between the company and the owners does not even make clear that the conventional incidents of agency were intended to be created. For instance, it is far from plain whether the corporation purported to bind the individual Harrisons in leasing, etc.; the contract does not so state explicitly and its terms do not implicitly require that result. (Some of the leases were signed by the company alone and some by both the company and the Harrisons.) Also, the plaintiffs argue that the contract waived the individuals' limited liability, but we agree with defend-ant that all that was provided was that the Harrisons would be chargeable for costs and expenses before receiving distributions; nothing was said as to liability to outsiders. These and like factors are not dispositive considerations, one way or the other, but *National Carbide* suggests that they are relevant. On the whole, as our text indicates, we are satisfied that a "true agency" relationship, under the *National Carbide* standards, was not established.

4. Proposals have been made to remove the particular limitation, but they have not yet been adopted.

**630**

"agent" agreement which is not in essence divorced from the owner-corporation relationship.

 On the subsidiary issue the trial commissioner wrote as follows:

"The remaining issue relates to the assessment against the corporation in 1968 of $647.33 in Federal Insurance Compensation Act taxes, penalties and interest for salaries of $3,200 each paid in 1960 by the corporation to Walter J. and William H. Harrison for services rendered by them to the corporation in that year while they were corporate officers, directors, and shareholders. The assessment was paid in equal shares by the three Harrisons. The plaintiff contends that, rather than being remuneration paid by the corporation to Walter J. and William H. Harrison for services rendered, and thus subject to FICA taxes, the sums paid were in reality extra distributions to them as partners. If so, the plaintiffs concede that the sums would be subject to the self-employment tax under section 1402 of the Internal Revenue Code, but it is not clear that such self-employment taxes were ever paid by the recipients. Since Article XV of the corporation charter authorizes the payment of ceiling salaries to the two individuals as corporate officers, which salaries were subsequently waived by formal authorization of the board of directors, and the account books of the corporation reflect that the sums received by the two individuals were paid them as salaries, it is presumed that the sums paid were salaries to corporate officers rather than distributions to partners, and the corporation was liable to pay FICA taxes thereon. United States v. Griswold, 124 F.2d 599 (1st Cir. 1941), cited by plaintiff is not controlling. There it was simply held that trustees in an investment trust who were not subject to shareholder control are not employees whose compensation was subject to the payment of Social Security taxes. The individuals in the case under consideration rendered services to the corporation for which the corporation was authorized to pay—and did pay—salaries. Thus, the assessment of FICA taxes, along with penalties and interest, was proper."

Plaintiffs have not excepted to this part of the trial commissioner's opinion or to his conclusion on this issue, and we adopt the quoted paragraph as our ground for rejecting this part of the claim.

The plaintiffs are not entitled to recover on any aspect of the case, and their petition is dismissed.