Sam C. and Patricia L. EVANS, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 75–3910.

United States Court of Appeals, Fifth Circuit.

Aug. 17, 1977.

Rodney J. Owens, Ronald M. Mankoff, Dallas, Tex., for petitioners-appellants.

Scott P. Crampton, Asst. Atty. Gen., Tax Div., Michael L. Paup, Mary L. Jennings, Gilbert T. Andrews, Act. Chief-Appellate Sect., U. S. Dept. of Justice, Meade Whitak-er, Chief Counsel, I. R. S., Washington D.C., for respondent-appellee.

Before THORNBERRY and GEE, Circuit Judges, and MARKEY,* Chief Judge.

MARKEY, Chief Judge:

Taxpayer[1] appeals from the decision of the United States Tax Court, 33 T.C.M. 1192 (1974), findings of fact amended, 34 T.C.M. 9 (1975), supplemental opinion, 34 T.C.M. 783 (1975), denying him personal deductions for depreciation and loss on the sale of an aircraft and for expenses of certain work on a dam. We affirm on the aircraft and reverse on the dam.

### The Aircraft

Taxpayer was an officer of Rolling International Inc. (Rolling). Rolling desired to purchase an aircraft but could not arrange financing. Foreseeing substantial profits from acquisition and leasing of an aircraft to Rolling, taxpayer executed, in March of 1969, a purchase order for the aircraft with Gates Aviation Corporation (Gates). The order was signed by taxpayer as "president of Sam C. Evans, Inc." (the corporation). Taxpayer gave his personal check for $25,000 and a personal note for $50,000 toward the aircraft price of $874,748 (exclusive of taxes). Taxpayer also executed a supplemental order on June 17, 1969, again as "President" of the corporation, for modifications to the aircraft, at a cost of $5,939.75.

To finance the balance of the aircraft price, taxpayer, executed, in the name of the corporation, a security agreement and a promissory note for $860,016 on June 27, 1969, in favor of the National Bank of Commerce (National). The proceeds of National's 9½ percent per annum loan were paid to Gates,[2] which conveyed title in the

---

* Of the U. S. Court of Customs and Patent Appeals, sitting by designation.

1. "Taxpayer" refers to appellant, Sam C. Evans, who filed, however, a joint return with Patricia L. Evans.

2. The total cost of the aircraft was $874,748.00 plus $5,939.75 or $880,687.75. Gates, however, received $860,016.00 from National plus $25,000.00 from taxpayer, or $885,016.00. Gates also received a $50,000.00 personal note from taxpayer. The record does not explain the discrepancy.

aircraft to the corporation in a bill of sale dated June 27, 1969. Taxpayer, on behalf of the corporation, then executed an application to register the aircraft with the Federal Aviation Administration.

Articles of incorporation for the corporation were executed on June 27, 1969, the corporation being formed for the purpose of procuring permanent financing on the aircraft.[3] Taxpayer and two of his attorneys were directors, and three employees of his attorneys were incorporators. A certificate of incorporation was issued by the State of Texas on June 30, 1969.

Permanent financing was obtained from Texas Western Financial Corporation (Western). In July, Western made a loan of $700,000, at 14 percent interest to the corporation. The note given by the corporation was signed by taxpayer as its president. National released its security interest in the aircraft to Western without recourse. A security agreement in favor of Western was executed for the corporation by taxpayer as its president. The $700,000 loan was applied to the principal of the $860,016 note held by National on July 10, 1969. National then issued a new note to the corporation for $160,016 at 9½ percent interest. In October, 1969, National issued a note to taxpayer personally for $160,016 at 9½ percent interest, the proceeds of which were used to pay off the note of the corporation in the same amount.

Also in July, the corporation leased the aircraft to Management Jets International, Inc. (MJI).[4] The agreement was executed on behalf of the corporation by taxpayer and was conditioned on an agreement (subsequently entered) for specified use of the aircraft by Rolling. On August 27, 1969, MJI made a first rental payment of $9,810 by check payable to taxpayer. On September 30, 1969, MJI made a second rental payment of $9,599.40 by check payable to the corporation. Both checks were endorsed by taxpayer and deposited in Rolling's account.

On August 19, 1969, taxpayer paid Western $5,988.91 as interest on the $700,000 loan. On August 25, 1969, he paid $8,335 on the principal of that loan. On September 12, 1969, Rolling paid Western $8,416.23 as interest and $8,335 on the principal of the $700,000 loan. On October 8, 1969, taxpayer paid Western $8,007.86 as interest.

On November 19, 1969, taxpayer signed both personally and as president of the corporation, a letter to MJI, in which it was stated that the aircraft was owned by the corporation, that it was leased to MJI, that Rolling was indebted to MJI for $33,985.09, and that MJI was authorized to deliver the aircraft to Gates for sale. In December 1969, the balance of the $700,000 loan was paid by Gates.

On December 16, 1970, articles of dissolution of the corporation were filed and a certificate of dissolution was issued. The articles stated that no stock had been issued, no business commenced, and no stock subscriptions received. No federal corporate income tax returns were ever filed.

Taxpayer's 1969 tax return claimed a net deduction on the aircraft of $72,010.71 ($96,769.80 in depreciation, less $24,759.09 in rental income). Taxpayer further claimed an ordinary loss of $90,828.45 on the sale of the aircraft.

The Commissioner, in a December 15, 1971 notice of deficiency, denied taxpayer's right to list the rental income, and to the deductions for depreciation and loss in relation to the aircraft.

---

**3.** Never intending to permanently finance the aircraft, National was interested in other business from taxpayer. Permanent financing necessitated an interest rate chargeable to a corporation but not to an individual under Texas law.

**4.** The lease agreement erroneously listed the title of the corporation as "Mr. Sam C. Evans, Inc."

### The Dam

In 1967, taxpayer purchased a farm on which there was an earthen dam and reservoir. The dam had been constructed of about 30,000 cubic yards of sandy or gravelly soil between 1958 and 1960. It was 500–600 feet long by 40 feet high and its sloping sides diverged from the top toward its 100-foot wide base.

Water began to seep through the dam after taxpayer's acquisition. Unsuccessful in various attempts to stop the seepage, taxpayer hired a contractor, who drained the reservoir, excavated soil from the dam's front section, and replaced the excavated soil with 10,000 cubic yards of clay to seal the dam. The reservoir was enlarged by ¼ to ½ acre. Upon completion of the work, the general appearance of the dam remained unchanged and water seepage had stopped.

On his 1969 tax return, taxpayer deducted the $49,844.95 cost of the work on the dam as an ordinary and necessary business expense. The Commissioner disallowed the claimed deduction.

### The Tax Court

The court held that the corporation was a viable and separate corporate entity for tax purposes citing *Moline Properties, Inc. v. Commissioner of Internal Revenue*, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943), and that taxpayer was not entitled to deduct depreciation on the aircraft, or the loss on its sale, finding the loans for purchase of the aircraft to have been made to the corporation, and the corporation to have been the registered owner of the aircraft. The court reasoned, 33 T.C.M. at 1208–1209:

* * * [P]etitioner and his attorneys discussed formation of a corporation to which the loan could be made. * * * This * * * is a valid business purpose for formation of a corporation.

* * * [L]oans were made to Sam C. Evans, Inc., the aircraft was registered to Sam C. Evans, Inc., a lease with MJI was entered into by Sam C. Evans, Inc. under the misnomer "Mr. Sam C. Evans, Inc." and one of the two payments under the lease was made to Sam C. Evans, Inc., and the aircraft was sold by Sam C. Evans, Inc.

* * * [P]etitioner contends that he used the "fictitious" name Sam C. Evans, Inc. to conduct his personal affairs. This conclusion we are not willing to reach. Petitioner was much too sophisticated a businessman to be unaware of the significance of the abbreviation "Inc."

* * * While the business of Sam C. Evans, Inc. was conducted by petitioner in a free-lance way, petitioner's objective actions held Sam C. Evans, Inc. out as a valid corporation. We do not think his payment of certain obligations of Sam C. Evans, Inc. by personal check requires a different result.

The Tax Court held that the work on the dam constituted a capital expenditure, not an ordinary and necessary business expense.

Taxpayer requested reconsideration, claiming an alternative deduction of $160,-016. The court's denial of the request (as untimely) was withdrawn when the parties' agreement on an essential fact enabled consideration of the alternative deduction on the evidence of record.

In a supplemental opinion, the court determined that the substitution of taxpayer's $160,016 note for that of the corporation was a guaranty and not a contribution to capital, so that taxpayer could not claim a loss under Code § 165(g) when the stock of the corporation became worthless upon sale of its sole asset, the aircraft. The court further determined that the substitution did not create a bad debt, deductible in 1969 under Code § 166(d), because it was an issuance of a note by a cash basis taxpayer to satisfy a guaranty, there having been no payment in 1969 on the taxpayer's note itself.

### Issues

The issues are whether the Tax Court erred in: (1) denying the claimed deductions for depreciation and loss in relation to the aircraft; (2) denying the claimed alternate deduction as either a loss under Code

§ 165(g) or a bad debt under Code § 166(d);[5] or (3) denying a deduction of the cost of work done on taxpayer's dam as an ordinary and necessary business expense.

## OPINION

### The Aircraft

■ We agree with the tax court that, for federal income tax purposes, a corporation is a separate taxable entity if it was formed for a valid business reason or conducted substantial business activities after its formation. The rationale was explained by the Supreme Court in *Moline, supra*:

> The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. *New Colonial Co. v. Helvering*, 292 U.S. 435, 442 [54 S.Ct. 788, 791, 78 L.Ed. 1348]; *Deputy v. du Pont*, 308 U.S. 488, 494 [60 S.Ct. 363, 366, 84 L.Ed. 416]. In *Burnet v. Commonwealth Improvement Co.*, 287 U.S. 415 [53 S.Ct. 198, 77 L.Ed. 399], this Court appraised the relation between a corporation and its sole stockholder and held taxable to the corporation a profit on a sale to its stockholder. This was because the taxpayer had adopted the corporate form for purposes of his own. The choice of the advantages of incorporation to do business, it was held, required the acceptance of the tax disadvantages. [319 U.S. at 438–439, 63 S.Ct. at 1134 (footnote omitted).]

In *Collins v. United States*, 514 F.2d 1282 (5th Cir. 1975), *aff'g per curiam*, 386 F.Supp. 17 (S.D.Ga.1974), this court recognized that formation of a corporation in order to obtain a loan at an interest rate usurious if made to an individual, the precise situation now before us, was a valid business purpose within the context of *Moline*. In affirming, this court described the district court's reasons as "well stated." The reasoning of the district court in *Collins* is found at 386 F.Supp. 20–21:

> Obviously, plaintiffs were keenly aware of the prospective advantages to them as individuals in the matter of depreciation and interest for tax purposes and anxious to preserve them. Faced with the fact that Georgia law did not permit the lending institution to charge the rate of interest it was accustomed to collect in construction loans, the tenants-in-common were forced to resort to the corporate form in order legally to pay the higher interest rate required. To preserve their tax deductions as individuals, the corporate phase of the venture was restricted to the barest minimum—the temporary borrowing and mortgaging in the name of a corporation. Bencap, Inc. was allowed to exist as little more than a name.

> The fact remains, however, that the corporation did exist and did perform the function intended of it until the permanent loan was consummated. It was more than a business convenience, it was a business necessity to plaintiffs' enterprise. As such, it came into being. As such, it served the purpose of its creation.

> * * * A taxpayer cannot shop on both sides of the street at the same time. He cannot avail himself of the business advantages of the corporate form while disregarding it in the case of its tax disadvantages. "[T]he choice of the advantages of incorporation to do business requires 'the acceptance of the tax disadvantages'." *Harrison Property Management Co., Inc. v. United States*, [475 F.2d 623, 201 Ct.Cl. 77] at 626 [(1973)].

■ In view of the non-existence of the corporation when title in the aircraft was

**5.** On appeal, the government argues that taxpayer's claim to alternative deductions raised new issues which should not be considered here. In view of the government's participation in the tax court proceedings on the issues, the invitation to disregard them here comes with poor grace and is declined.

conveyed by Gates,[6] and in view of the evidence as a whole, taxpayer contends that the corporation did not have title to the property (the aircraft) related to the business purpose for which the corporation was formed. Though we agree with the tax court that the corporation held legal title to the aircraft in the present case, this court has considered and rejected the contention that the locale of either legal or equitable title is controlling. In *Tomlinson v. Miles,* 316 F.2d 710 (5th Cir. 1963), *cert. denied,* 375 U.S. 828, 84 S.Ct. 71, 11 L.Ed.2d 60 (1963), it is stated, 316 F.2d at 714:

> On the surface of it there would hardly seem to be any doubt but that this corporation had the purpose "to serve the creator's personal or undisclosed convenience" and that this was "followed by the carrying on of business of the corporation." The taxpayers take the position that the mere carrying on of business by the corporation, to satisfy this requirement of the *Moline Properties* case, must be business relating to property to which it has title, either legal or equitable. They contend that this corporation was the holder of a mere naked record title with neither legal nor equitable ownership of the property and that therefore such business as was carried on by the corporation does not fall within the formula that is above set out. We find no such limitation in the formula adopted by the Supreme Court in the Moline Properties case. That no such limitation is intended is made clear by the Court's subsequent opinion in *National Carbide Corporation v. Commissioner of Internal Revenue,,* 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779.

Moreover, the substantial business activities conducted by the corporation, subsequent to June 30, 1969, serve to bring the present case even more clearly within the purview of the holding in *Moline.* It obtained a loan from Western; gave Western a security interest in the aircraft; leased the aircraft to MJI; received payments under the lease; gave a $160,016 note to National; and instructed MJI to return the aircraft to Gates for sale.

Taxpayer next argues that he is entitled to the deductions for depreciation and loss on the aircraft because he was personally liable on the loans which financed it and possessed the "economic investment" in it. Having considered both contentions in the light of the entire record, we find them without merit.

The tax court committed no error in denying taxpayer his claimed deductions for depreciation under Code § 167, and loss, under Code § 165, on the aircraft.

## *The Alternative Deductions*

We also agree with the tax court that taxpayer, in executing a personal note for $160,016 in October, 1969, was merely honoring his earlier guaranty to National in relation to its prior loan of that amount to the corporation. Taxpayer acted for the corporation in executing the aircraft purchase, in obtaining the first loan for $860,-016, in causing transfer of title from Gates to the corporation, and in substituting for the first loan a $700,000 loan from Western and a $160,016 loan from National to the corporation. The note evidencing the latter had "Lear Jet" crossed out and "Gty" inserted, reflecting the surrender of National's security interest in the aircraft and its reliance on a guaranty. If taxpayer had been personally liable on the $160,016 note to the corporation, there would have been no reason to substitute his personal note when the corporate note came due. Taxpayer's reliance on state law for the proposition that his failure to include indication of his agency rendered him personally liable is misplaced. Though the evidence is clear that those who dealt with the events herein were not misled, we need not review that evidence in detail. The finding of the tax

---

**6.** Texas recognizes corporate adoption of preincorporation contracts. *See, e. g., Lancaster Gin and Comp. Co. v. Murray Ginning-System Co.,* 19 Tex.Civ.App. 110, 47 S.W. 387 (1898); 14 Tex.Juris 2d, Corporations, § 26. It would be incongruous, moreover, if taxpayer were permitted to control the tax consequences of his actions by merely delaying the date on which he formed the corporation.

court that taxpayer was for tax purposes a guarantor is fully supported by the facts of record.

Hence the tax court correctly rejected taxpayer's argument that the substitution of his personal note amounted to a capital contribution of $160,016 to the corporation entitling him to a deduction in that amount under Code § 165(g) when the corporation and his interest in it became worthless.

The tax court was equally correct in denying taxpayer's claim under Code § 166 to a bad debt deduction in relation to the substitution of his personal note. That action was simply not a recognizable tax event for taxpayer, who reported on a cash basis of accounting. Having made no cash outlay in relation to this indebtedness in 1969, taxpayer could claim no bad debt deduction under Code § 166 for 1969.

### The Dam

■ Expenses incurred in the ordinary and necessary course of business are deductible under Code § 162. The construction of "ordinary and necessary" controls, and each case must be determined on its own facts and circumstances. *Jones v. Commissioner of Internal Revenue,,* 242 F.2d 616 (5th Cir. 1957).

■ We find the expenses for the work done on taxpayer's dam deductible as an ordinary and necessary business expense. The record establishes that taxpayer's sole purpose in undertaking the expense was to prevent the dam from leaking and thus to keep it in an ordinary operating condition over its probable useful life and for the use for which it was acquired. The work did not create a replacement for the dam, but merely restored the capability of retaining water which it had, so far as the record reflects, at the time taxpayer acquired it. If the work be considered repair, it did not in our view materially add to the value or materially prolong its ordinary life. Nothing of record establishes that the alleged enlargement constituted a material increase in value. To some extent, of course, every repair or restoration, no matter how minor or how soon after acquisition it is done, will add some value and will prolong the useful life of the thing repaired or restored. Fixing leaks in a dam on a farm, however, can hardly be considered an extraordinary or unexpected expense. Nor can such expense be considered other than necessary in the conduct of the business of farming. The purpose of the expense being of substantial influence in applying the test, we think the work on the dam entailed expenses incurred in the ordinary and necessary course of taxpayer's farming business. In the circumstances of record here, the differences in the condition of the dam before and after the work done on it were insufficient to require that the expenses of that work to be considered a capital expenditure.

### Conclusion

We affirm the tax court's denial of all of the claimed deductions pertaining to the · aircraft as not being allowable to taxpayer. We reverse the tax court's denial of the claimed deduction for the expense of the work on taxpayer's dam.