Davis, Judge,
delivered the opinion of the court :*
The central issue turns on whether profits in the tax years 1960-63 derived principally from oil leases to property, the record title to which is in the name of a management corporation, are properly taxable to the corporation, as the defendant maintains or, as the plaintiffs contend, they are taxable solely to the individuals who, while retaining beneficial ownership of the property, transferred title to the corporation of which they were the sole incorporators, stockholders, officers, and directors. A subordinate issue is whether minor amounts paid by such corporation to two of its three shareholders as wages are properly classified as wages and are taxable accordingly under the Federal Insurance Contribution Act. The Government prevails on both issues.
Walter J. Harrison, William H. Harrison, and Mrs. Lydia Harrison Couturie Byan, brothers and sister, owned extensive oil-bearing acreage and a headquarters building in Louisiana which, prior to April 14,1960, they had operated through Crescent Commercial Company, their family partnership. On April 14,1960, the three individuals formed the plaintiff corporation, Harrison Property Management Co., Inc., to which they transferred title to the property in question, without warranty or consideration, reserving to themselves beneficial title to the property and all rights to proceeds of existing leases thereon for mineral rights and rights-of-way. The corporation replaced the partnership, and was formed primarily for the stated purpose of providing for efficient management in the event of the death of one of the individuals. There is no hint that tax evasion or avoidance motivated the transaction.
*81 The corporate charter tightly limited the rights, power, and authority of the corporation to conduct its business with particular reference to such transactions as acquisition of real property, investment of funds, fixing of officers’ salaries, employment of personnel, adoption or repeal of by-laws, borrowing or lending of money, and sale or encumbrance of property, all of which transactions required unanimous approval of the shareholder directors. The transferors, who were the incorporators and became the sole stockholders of the corporation in equal proportions, as well as its sole officers and directors, retained full control of corporate decisions as to the matters specified. The charter required approval of a majority of the directors for the granting of leases, rights-of-way, licenses, or permits regarding the property transferred to the corporation “for administration and management purposes”, and prohibited transfers of such rights so as to favor one officer or shareholder over another, directly or indirectly.
Contemporaneously with the incorporation the individuals and the corporation entered into an agreement which specified that the transfer of property to the corporation was made “solely and only as a matter of convenience and accommodation and without consideration whatsoever” having been paid by the corporation to the individuals, who were expressly identified as the “beneficial owners” and “true owners” of the property transferred, with the corporation disclaiming “any right, title, or interest” in and to the property other than the right to manage and administer it. By the agreement the corporation’s expenses were to be charged against the three individuals in equal amounts by means of deductions from proceeds of operations distributable periodically to the individuals. The agreement also provided for the retransfer without consideration of any part of the corporate property to the individuals on a proportionate basis, required the corporation in the event of its breach of the agreement to retransfer all of the property proportionately to the individuals without consideration on due notice and demand by them, and required the retransfer of the property to the individuals after 50 years.
*82 Throughout the taxable years in issue the corporation complied in all respects with the agreement’s terms. It deducted from corporate revenues all expenses and credited the balance in proportionate amounts to accounts of the individuals, who received such earnings directly. The individuals were obligated to replenish the corporation’s funds for costs and expenses, as needed, again on a proportionate basis. Besides payments for leases (the major source of income), receipts included cash contributions from shareholders, building demolition proceeds, profits from land sales, camp rentals, and pecan sale proceeds. Disbursements included salaries, payments to shareholders, taxes, cost of litigation and professional services, supplies, travel expenses, utilities, maintenance costs, commissions, insurance premiums, land care expense, contributions, and petty cash. The corporation maintained a checking account and recorded all receipts and disbursements on its books and records. No loans were made by or to the corporation.
The members at the first meeting of the board of directors of the corporation on April 15, 1960, specified that it was to be regarded purely as a “management instrument only” without change from the Crescent Commercial Company partnership which it succeeded, and stated the purpose of forming the corporation to be “solely to provide for efficient management in the event of the death of one of the Harrisons.”
Each of the incorporators contributed $5,000 to the authorized capital of $15,000, and received in exchange 50 of the 150 authorized and issued shares of capital stock. The corporation and the individuals joined in suits. Some leases were signed by the corporation alone and some by it and the individuals. The corporate accounts reflected the three individuals as joint owners of the properties whose nominal title had vested in the corporation. The company maintained capital accounts in the names of the three individuals and generally speaking kept its financial and accounting records in much the same way as Crescent Commercial Company, the family partnership which it succeeded.
For calendar year 1960 the corporation filed a United States Fiduciary Income Tax Keturn on Form 1041, showing *83 a distribution of net income proportionately to the three individuals. In 1961, 1962 and 1963 the corporation filed returns on Form 1120, reporting no income or expenses but accompanying each return with a schedule showing the proportionate distribution of income and expenses to the three individuals. In each of the calendar years 1960 through 1963 the individual plaintiffs filed separate Federal tax returns reporting the income and expenses allocated to them by the corporation. The taxes were paid accordingly. On February 9, 1968, the Internal Kevenue Service made timely assessments of taxes and interest against the corporation as shown in the findings. The assessments against the corporation were paid by the three individual plaintiffs on a proportionate basis. Claims for refund were duly filed by the corporation, and disallowed on March 28, 1969, resulting in this suit.
On the major issue of whether the management corporation is itself taxable on its income, there are well-established standards which confine and guide our ruling. The Supreme Court has spoken twice, in Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943), and National Carbide Corp. v. Commissioner, 336 U.S. 422 (1949). The precedents in this court are Garner v. United States, 188 Ct. Cl. 202, 412 F. 2d 233 (1969), and Love v. United States, 119 Ct. Cl. 384, 96 F. Supp. 919 (1951). A leading case in the courts of appeals is Tomlinson v. Miles, 316 F. 2d 710 (C.A. 5), cert. denied, 375 U.S. 828 (1963). Under the principles declared and applied in those decisions, it is very clear that— putting aside for the moment the contract (which plaintiffs call an agreement of agency) made by the individuals with the corporation at the time it was set up — the corporation was taxable.
The paramount principle is that stockholders of a closely held corporation cannot demand (Subchapter S aside) that it be ignored for federal income tax purposes — at least if it is more than a pure sham and was created or acts for some business end. “The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve *84 the creator’s personal or undisclosed convenience, so long as tbat purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.” Moline Properties, Inc. v. Commissioner, supra, 319 U.S. at 438-39 (footnotes omitted). Where individuals adopt the corporate form for purposes of their own, the choice of the advantages of incorporation to do business requires “the acceptance of the tax disadvantages.” Ibid. It is immaterial that the shareholders remain the beneficial owners of the property transferred to the company, or that the latter’s policies and day-to-day activities are determined, not as decisions of the corporation, but by the owners acting individually. National Carbide Corp. v. Commissioner, supra, 336 U.S. at 433-34; Tomlinson v. Miles, supra, 316 F. 2d at 714; Carver v. United States, supra, 188 Ct. Cl. at 212-13, 412 F. 2d at 239. By the same token, it does not matter that the corporation is regarded by its owners as a simple “dummy”. National Carbide Corp. v. Commissioner, supra, 336 U.S. at 433; Love v. United States, supra, 119 Ct. Cl. at 405, 96 F. Supp. at 922. The controlling tests, ignoring the fact that the corporation is substantially the alter ego of the stockholders, concentrate on the reasons why the “dummy” was created, and what it actually does.
Harrison Property Management Co. Inc. was formed for the three Harrisons’ own “convenience”, in that its primary purpose was to provide for efficient management if one of them died, and a lesser aim apparently was to decrease the need for the signatures of all three owners in routine operations. Those are, of course, business goals — perfectly acceptable business purposes — deliberately sought by the Harrisons for their own ease and advantage. Other benefits of the corporate form would also accrue to the shareholders, as the Fifth Circuit pointed out in the similar case of Tomlinson v. Miles, supra, 316 F. 2d at 713.
Moreover, this corporation was actually used, and performed business functions. It authorized and executed leases for mineral rights, granted several rights-of-way, sold some produce, acted as a party in litigation, hired executive officers, paid local taxes, maintained its building, kept a checking *85 account, recorded its receipts and disbursements, held meetings of stockholders and directors, and followed the formalities of corporate operation. It was by no means dormant or inert. On the contrary, its business activity was fully comparable to that found in Tomlinson v. Miles, supra, and more than in Owner — both of which held the corporation a taxable entity.[1] We know of no case which, on similar facts, has disregarded the corporation, at the instance of the shareholders, as not engaging in enough business activity. In Paymer v. Commissioner, 150 F. 2d 334 (C.A. 2, 1945), the court of appeals upheld the taxability of one corporation which carried on somewhat less activity than Harrison Property Management Co., Inc., but disregarded as sham a sister company which did nothing but take and hold title to some real estate as a blind to deter the creditors of one of the shareholders.
Plaintiffs, however, do not put their major emphasis on the status of the corporation apart from the side agreement. Fundamentally, they rest on this contract between the Harrisons and the Management Company which, in their view, brings this case within the exception recognized by the Supreme Court in National Carbide Corp. v. Commissioner, supra, 336 U.S. at 437: “What we have said does not foreclose a true corporate agent or trustee from handling the property and income of its owner-principal without being taxable therefor.” The claim is that by this pact, made contemporaneously with the birth of the corporation, the company was made, and continued to act as, such a “true corporate agent.”
National Carbide makes it clear that the formal designation of “agency agreement” is not conclusive; the significant criteria, as we understand them, are whether the so-called “agent” would have made the agreement if the so-called
*86 “principals” were not its owners, and conversely whether the “principals” would have undertaken the arrangement if the “agent” were not their corporate creature. The Court put it thus: “If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal * * *” (336 U.S. at 437), and the opinion illustrated that premise by saying of the corporate parent in that case (Aireo, the alleged “principal”) : “The entire earnings of petitioners [Airco’s subsidiaries, the alleged “agents”], except for trifling amounts, are turned over to Aireo not because the latter could command this income if petitioners were owned by third persons, but because it owns and thus completely dominates the subsidiaries. Aireo, for sufficient reasons of its own, wished to avoid the burdens of principalship. * * * It cannot now escape the tax consequences of that choice, no matter how bona fide its motives or longstanding its arrangements. When we referred to the ‘usual incidents of an agency relationship’ in the Moline Properties case, we meant just that — not the identity of ownership and control disclosed by the facts of this case” (336 U.S. at 438-39).
An example of a “true” agency (or “true” trusteeship) under this standard was found by this court in Carver v. United States, supra, 188 Ct. Cl. at 213-14, 412 F. 2d at 239-40, where the wholly-owned corporation acted on behalf of a non-owner independent third-party in the same way as it did for its individual owner. The relationship to this third-party, an outsider, demonstrated that, with respect to that transaction, the company’s agency connection with its owner was not dependent on the fact of ownership.
Unlike this aspect of Carver, we do not doubt that the present plaintiffs fail the test. It is inconceivable that Harrison Property Management Co., Inc. would have made its alleged “agency” contract with property owners other than its own shareholders, the Harrisons, or that the latter would have agreed to such an arrangement with the corporation if they did not own and control it. 'Obviously the agreement was deliberately drawn, in conjunction with the special provisions of the corporate charter, so that the company would service its owners alone, and was made solely *87 because they were its owners. The entire operating arrangement was custom-made for that very purpose. The total arrangement assured, for instance, that each of the three Harrisons (or a representative) would be one of the three directors of the corporation; that sales of property would have to have the approval of all three but that two would be enough for future leases; that certain activities (including acquisition of land and making investments) would also require the unanimous consent of all three; that expenses were to 'be charged equally against the three; and that the property transferred to the corporation would be transferred (before the end of the corporate life in 50 years) only if all three should so demand (except in case of breach by the company or failure to manage part of the property). Thus, many of the important activities of the company required consent of all three Harrisons (or their designees), while the rest called for approval of two of them. In other words, all of the corporation’s relations with the beneficial owners of the managed property were wholly dependent on the fact that they were the sole shareholders.
Several of the points made to support a “true agency” here seem to assume that the Molme Properties-National C arbide-Love-T omlinson-C arver rule for the taxability of close corporations, discussed earlier in this opinion, can be avoided by the simple device of having the company and its owners execute an “agreement” designating the former as “agent” and the latter as “principal”, regardless of the actual relationships and the realistic operations of the corporation. We have already pointed out that the National Carbide opinion, which rejected such an agreement (comparable to the one we have before us) as establishing a “true agency”, squarely disposes of that postulate, and on the contrary calls for a more substantial showing that the comiection between the self-designated “principal” and “agent” is independent of the “principal’s” ownership of and control over the “agent”.[2]
*88 National Carbide also answers other contentions raised on behalf of plaintiffs. One is that the “principals” (here, the Harrisons) received all the profits directly. As to this, the Supreme Court said (836 U.S. at 436) :
The Tax Court felt that the fact that Aireo [the “principal” and owner in that case] was entitled to the profits by contract shows that the income “belonged to Aireo” and should not, for that reason, be taxed to petitioners [the “agents”, wholly-owned corporations]. Our decisions requiring that income be taxed to those who earn it, despite anticipatory agreements designed to prevent vesting of the income in the earners, foreclose this result. [Citing cases]. Of course, one of the duties of a collection agent is to transmit the money he receives to his principal according to their agreement. But the fact that petitioners were required by contract to turn over the money received by them to Aireo, after deducting expenses and nominal profits, is no sure indication that they were mere collection agents. Such an agreement is entirely consistent with the corporation-sole stockholder relationship whether or not any agency exists, and with other relationships as well.
Another circumstance negatived by the National Carbide opinion as showing “true agency” is that the “agent’s” assets all came from the owner-“principal”, without real consideration in return. 336 U.S. at 434 — 35, 438. The Court thought it irrelevant on the agency issue whether the funds supplied by the owner were capital contributions or loans; in either case the parent was not a true principal. Similarly in our case the fact that the Harrisons supplied the Management Company’s assets and its operating capital is ineffective to create a “true agency”.
In National Carbide the purported “agents” (subsidiary corporations) carried on more extensive activities than Property Management did here but each of those subsidiaries was limited in its functioning (336 U.S. at 424-25), just as the Harrisons’ company was restricted to the management of certain real estate. In neither instance was the “agent” per *89 mitted to perform all the functions of the “principal”. And we have held in the first part of this opinion that the limited activity carried on by Harrison Property Management, which clearly resulted in income from leasing and otherwise, was enough for taxability under the Moline Properties principle.[3]
We close on this issue by noting that it is especially important to adhere to the National Carbide tests in cases, such as this, of closely-held small corporations. In Subchapter S, sections 1311-1379 of the 1954 Code, Congress has provided, in defined circumstances, for the treatment of such companies as partnerships, with the stockholders rather than the corporation paying the income tax on the profits. It appears highly probable that Harrison Property Management Company, though a small business corporation, could not qualify for Subchapter S benefits because more than 20 percent of its receipts in the taxable years was “passive investment income” from rents — a specific exception contained in Section 1372 (e) (5). This limitation is still an integral part of the Congressional design for lifting the tax from the corporation [4]— an existing legislative restriction which would be thwarted if non-eligible companies could attain the same result by the simple procedure of a surfacial “principal”-“agent” agreement which is not in essence divorced from the owner-corporation relationship.
On the subsidiary issue the trial commissioner wrote as follows:
*90 “The remaining issue relates to the assessment against the corporation in 1968 of $647.33 in Federal Insurance Compensation Act taxes, penalties and interest for salaries of $3,200 each paid in 1960 by the corporation to Walter J. and William H. Harrison for services rendered by them to the corporation in that year while they were corporate officers, directors, and shareholders. The assessment was paid in equal shares by the three Harrisons. The plaintiff contends that, rather than being remuneration paid by the corporation to Walter J. and William H. Harrison for services rendered, and thus subject to FICA taxes, the sums paid were in reality extra distributions to them as partners. If so, the plaintiffs concede that the sums would be subject to the self-employment tax under section 1402 of the Internal Kevenue Code, but it is not clear that such self-employment taxes were ever paid by the recipients. Since Article XV of the corporation charter authorizes the payment of ceiling salaries to the two individuals as corporate officers, which salaries were subsequently waived by formal authorization of the board of directors, and the account books of the corporation reflect that the sums received by the two individuals were paid them as salaries, it is presumed that the sums paid were salaries to corporate officers rather than distributions to partners, and the corporation was liable to pay FICA taxes thereon. United States v. Griswold, 124 F. 2d 599 (1st Cir. 1941), cited by plaintiff is not controlling. There it was simply held that trustees in an investment trust who were not subject to shareholder control are not employees whose compensation was subject to the payment of Social Security taxes. The individuals in the case under consideration rendered services to the corporation for which the corporation was authorized to pay — and did pay — salaries. Thus, the assessment of FICA taxes, along with penalties and interest, was proper.”
Plaintiffs have not excepted to this part of the trial commissioner’s opinion or to his conclusion on this issue, and we adopt the quoted paragraph as our ground for rejecting this part of the claim.
The plaintiffs are not entitled to recover on any aspect of the case, and their petition is dismissed.
*91 FINDINGS op Fact
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and arguments of counsel, makes findings of fact as follow:
1. On or about April 14, 1960, and for some time prior thereto, Walter J. Harrison, William H. Harrison and Mrs. Lydia Harrison Couturie Byan ('hereafter Walter, William, and Lydia, for convenience) were the owners of approximately 22,000 acres of land (sometimes hereinafter referred to as “Harrison lands”), in the Parish of Lafourche, State of Louisiana.
2. The Harrison lands were adaptable to the trapping of fur-bearing animals and the production of oil and gas. They were not useful for any other purpose.
3. (a) On April 14, 1960, Walter, William, and Lydia transferred the Harrison lands, a building at 507 Decatur Street in the city of New Orleans that was used by the trans-ferors as their office and for the handling of fur-bearing animals which were at one time caught on the Harrison lands, and the furniture, furnishings and equipment that were used in the operation of said office (all of said property is hereafter sometimes referred to as “the property”), to Harrison Property Management Co., Inc., by a notarial deed. The deed granted title in fee without a warranty, but with full sub-rogation in and to all rights of warranty held by preceding owners and vendors. The only reservations in the deed were prior recorded rights-of-way, lease grants and servitudes, and any right, title and interest of the vendors to all existing oil, gas and mineral leases and to all rents and royalties thereunder.
(b) Immediately following the above transfer, the transaction was recorded in the journal of Harrison Property Management Co., Inc. by debiting the various asset items involved in the transfer and crediting the total aggregate value on a proportionate basis, to Walter, William, and Lydia.
4. At all times mentioned in the petition, Harrison Property Management Co., Inc. (taxpayer), was a Louisiana corporation, incorporated on April 14, 1960, following dissolu *92 tion of a partnership of its stockholders, and was domiciled in the city of New Orleans. The Articles of Incorporation contained the following pertinent provisions:
Article II
The objects and purposes for which this corporation is organized are declared to be as follows:
To administer and otherwise manage the property, real, personal and mixed, of any person or persons, firm or firms, corporation or corporations, whether under a power of attorney or otherwise, and in connection therewith to hold title to some or all of said property (for administration and management purposes only); to negotiate leases relative thereto; to grant rights of way thereon or thereover; and to otherwise arrange for the use and development of such property.
To manage, supervise and administer the operation of any business or undertaking on any property subject to administration by the corporation when authorized by all of the members of the Board of Directors of this corporation.
ARTICLE III
The duration of this corporation shall be for a term of fifty (50) years.
$ $ # # ‡
Article XV
Unless authorized by the unanimous vote of all three of the members of the Board of Directors of this corporation given at a meeting of said Board of Directors duly called for such specific purposes, after notice of such meeting has been given to each director by United States registered mail at least ten (10) days prior to said meeting, the said notices to be sent to the directors at the addresses of said directors as shown in the official records of the corporation, this corporation shall have no right, power or authority whatsoever to:
1. Exercise any of the rights granted, authorized and/or permitted by K. S. 12:23, 12:24, 12:46, 12:48, 12:54 and 12:63; [Louisiana Code provisions]
2. Acquire, by purchase or otherwise, any property of any nature or kind whatsoever, other than office *93 furniture and fixtures, marine supplies and automotive equipment, and the like, which may be required for the proper conduct of the corporation’s affairs;
3. Invest any funds of the corporation in any property of any nature or kind whatsoever, whether tangible or intangible, or real, personal or mixed, other than as hereinabove authorized in the immediately preceding paragraph 2 of this Article;
4. Increase the salary or compensation to be paid to the president of this corporation over and above the sum of four hundred ($400.00) dollars per month or increase the salary or compensation to be paid to the secretary-treasurer of this corporation over and above the sum of four hundred ($400.00) dollars per month;
5. Engage in the employ of this corporation any person or persons other than the officers of this corporation and such other personnel or clerical employees as may be necessary for the proper conduct of the corporation and its affairs;
6. Make or adopt by-laws or repeal or amend any such by-laws so made and adopted in the manner herein provided;
7. Borrow or lend money; or,
8. Except as provided in Article XVI hereof, sell, transfer, dispose of, pledge, mortgage or otherwise alienate, transfer or encumber any property of any nature or kind whatsoever, title to which stands in the name of this corporation, or any right, title or interest therein or thereto.
Article XVI
When authorized by a majority of all of the directors of this corporation, this corporation may grant leases, licenses, permits or rights for mineral or trapping purposes, or otherwise, in or to, and/or grant rights of way on or over any property, title to which has been placed in this corporation for administration and management purposes, provided, however, that no such lease, license, permit or right, and/or right of way shall be granted by this corporation to or in favor of any officer, shareholder or director of this corporation, or to or in favor of any relative thereof by blood or affinity, or to or in favor of any firm or corporation in which any such officer, shareholder or director, or in which any relative or relatives of them, or of any of them, whether by blood or affinity, is or are interested, either directly or indirectly,* or to or *94 in favor of any person having any interest of any nature or kind whatsoever in the land which is the subject of such lease, license, permit or right, or right of way, and title to which said land has been placed in this corporation for management purposes only, or to or in favor of any person having any interest in any agreement made with this corporation by the owners of any property, title to which has been placed in this corporation for management purposes, or to or in favor of any relative of any such person, whether by blood or affinity, or to or in favor of any firm or corporation in which they or any of them, or in which relatives of them or any of them, whether by blood or affinity, is or are interested, either directly or indirectly, unless, in any of such events, the giving and granting of such lease, license, permit or right, and/or right of way be authorized in writing by all three of the directors of this corporation. ijc ijc
5. Other features of Harrison Property Management Co., Inc. included:
(a) Its sole incorporators were Walter, William, and Lydia;
(b) Its authorized capital was fixed at $15,000 represented by 150 shares of the Par Value $100 Per Share Common Capital Stock, divided into 50 shares of Class A Stock which went to Walter, 50 shares of Class B Stock which went to William, and 50 shares of Class C Stock which went to Lydia. Each of the individuals paid $5,000 for his stock.
(c) The. three classes of Common Shares had all of the same rights and privileges, except each class elected one member of the Board;
(d) There were certain pre-emptive rights, by classes, and there were certain restrictions on the sale or other disposition of the shares;
(e) William was President, Lydia was Vice President, and Walter was Secretary-Treasurer from the inception to the date of trial; and Walter and William conducted all of the corporate affairs as authorized by the board of directors.
6. On April 14, 1960, the taxpayer corporation entered into an agreement with the three transferors, the principal provisions of which read as follows:
1. Contemporaneously with the execution of this agreement Owners have, by act passed before C. Ellis *95 lienican, Notary Public in and for the Parish of Orleans, State of Louisiana, dated of even date herewith, transferred to Management Corporation certain property, ¡hereinafter sometimes referred to as “Property”, more fully described in said act, a certified copy of which, marked Exhibit A, is annexed hereto and made part hereof as though set forth at length herein. It is agreed by the parties hereto that such Property, so transferred by Owners to Management Corporation, shall be held, administered and disposed of by Management Corporation in the proper exercise of its corporate powers and subject to and on the terms and conditions hereinafter set forth, irrespective of any provisions or lack of provisions in the formal deed by which said Property was so transferred by Owners to Management Corporation:
(a) Transfer of the aforesaid Property by Owners to Management Corporation has been made solely and only as a matter of convenience and accommodation and without any consideration whatsoever having been paid therefor by Management Corporation to Owners and Management Corporation does herein and hereby acknowledge that it has not, in truth and in fact, any right, title or interest in and to said Property other than the right to manage and administer said Property pursuant hereto and that the record title to said Property has been transferred to Management Corporation solely and only to enable Management Corporation to so administer and manage said Property as hereinafter provided, the said Owners and the executors, administrators, heirs, legatees and assigns of said Owners, hereinafter sometimes referred to as “Beneficial Owners”, being and remaining the true owners of said Property.
(b) As long as title to the aforesaid Property stands in the name of Management Corporation, said Management Corporation shall have and enjoy the right to operate, administer and manage said Property in the proper exercise of its corporate powers, as set forth and delineated in its Articles of Incorporation, including (i) the making of leases, whether for oil, gas or other minerals or for the trapping of fur bearing animals, or otherwise; (ii) the selling of shells, gravel and other similar deposits that may be found on said Property; (iii) the selling of such timber as may be located thereon; and (iv) the granting of rights of way on, over and through such Property.
(c) During the administration and management of the aforesaid Property by Management Corporation, all *96 costs and expenses, hereinafter defined in paragraph (d) hereof, incurred or expended by Management Corporation in connection with the administration and management of said Property, shall be charged to and against the Owners and/or Beneficial Owners of the aforesaid Property in the proportions of the true ownership of the aforesaid Property by each such Owner and/or Beneficial Owner.
(d) The costs and expenses that Management Corporation shall have the right to incur and expand hereunder for the account of the Owners and/or Beneficial Owners of the aforesaid Property and to deduct from the revenues and proceeds derived from the administration and management of the aforesaid Property, and to which such Owners and/or Beneficial Owners shall be entitled, all as herein provided, shall be and consist of all expenses of Management Corporation chargeable to or incurred for the benefit of all of such Owners and/or Beneficial Owners of the aforesaid Property in the administration and management thereof, including, but without limiting the generality of the foregoing, officers’ salaries, office rent, telephone and telegraph charges, office light and heat, wages of office personnel, cost of patrolling the Property and of having lines marked, cost of the making of ground and other surveys and studies, cost of any new or used materials, supplies, furniture and fixtures, and automotive and marine equipment and the like reasonably needed and used by Management Corporation in carrying out its responsibilities hereunder, as well as all overhead and administrative expenses as are applicable to the managing and administering of the aforesaid Property, it being understood, however, that the amount of such costs and expenses to be charged against each such Owner and/or Beneficial Owner shall be proportionate to the interest of each such Owner and/or Beneficial Owner in and to the aforesaid Property.
(e) During the administration and management of the aforesaid Property by Management Corporation, and at least once each year from and after the date hereof, all revenues and proceeds derived from the administration and management of the aforesaid Property, pursuant to the provisions hereof, shall be credited to the account of each Owner and/or Beneficial Owner and shall be paid to each such Owner and/or Beneficial Owner after deducting therefrom all of the proper costs and expenses that are chargeable against each of them, all as hereinabove set forth in paragraph (d) hereof.
*97 (f) If the management and administration of the whole or any part or portion of the aforesaid Property by Management Corporation should be discontinued at any time for any reason whatsoever, then, and in any such event, any Owner and/or Beneficial Owner may demand, in writing, that Management Corporation re-transfer said Property to such Owner and/or Beneficial Owner in the proportion of the then ownership of such Owner and/or Beneficial Owner in such Property, and Management Corporation binds and obligates itself to forthwith transfer such portion of said Property to said Owner and/or Beneficial Owner without consideration and by a proper and appropriate instrument of transfer similar to the form of that annexed hereto and marked Exhibit A.
Furthermore, if Owners and/or Beneficial Owners, representing in the aggregate the entire ownership of the aforesaid Property, should demand, in writing, that Management Corporation retransfer said Property to such Owners and/or Beneficial Owners, Management Corporation binds and obligates itself to forthwith transfer such Property to said Owners and/or Beneficial Owners without consideration and by a proper and appropriate instrument of transfer similar to the form of that annexed hereto and marked Exhibit A.
The obligations of Management Corporation to so transfer, as hereinabove provided, may be enforced in any legal manner available to the Owners and/or Beneficial Owners, including, but not limited to, a mandatory injunction or judgment for specific performance.
(g) It is agreed by and among the parties hereto that, in the event that Management Corporation should violate any of the terms, provisions or conditions herein contained or commit any default hereunder and such violation or default shall continue for more than thirty days after written notice of such violation or default has been given to Management Corporation by United States registered mail, any one or more of the Owners or any one or more of the Beneficial Owners may demand, in writing, that Management Corporation re-transfer all of the aforesaid Property to the then Owners and/or Beneficial Owners in the proportion of their then ownership in such Property and Management Corporation shall thereupon forthwith transfer such Property by a proper and appropriate instrument of transfer similar to the form of that annexed hereto and marked Exhibit A. The obligation of Management Corporation to so transfer such Property may be enforced in any legal *98 manner, including, but not limited to, a mandatory injunction or judgment for specific performance.
(li) In tbe event that a re-transfer of the aforesaid Property has not been effected under the provisions of paragraphs (f) or (g) hereof within fifty years from and after the date hereof, this agreement shall, upon the expiration of said fifty year period, ipso facto terminate and Management Corporation shall thereupon forthwith execute a proper and appropriate instrument of transfer re-transferring said Property to the Owners and/or Beneficial Owners in the manner hereinabove set forth in paragraph (g) hereof. ifs % # ^ *
(j) As will appear from the act passed before C. Ellis Hentcan, Notary Public in and for the Parish of Orleans, State of Louisiana, dated of even date herewith and here-inabove referred to in paragraph 1 of this agreement, there has been excepted from the transfer contained in and by said act all right, title and interest of the Owners in and to all oil, gas and mineral leases presently covering and/or bearing against the Property described in and covered by said 'act of transfer, or any part or portions thereof, and all right, title and interest of the said Owners in and to the right to receive all rents and royalties due and/or to become due and payable under said leases, the said right, title and interest of said Owners in and to said leases and in and to the right to receive the rents and royalties thereunder having been by said act expressly reserved to said Owners. In order to effectuate and carry out such agreements the parties hereto herein and hereby agree and bind and obligate themselves, and each Of them, to sign and execute all such division orders and/or other documents and agreements that may be necessary and appropriate from time to time to enable Owners and/or Beneficial Owners to receive directly and without passing through Management Corporation all rents, royalties and other proceeds of every nature or kind whatsoever presently due or to become due to Owners and/or Beneficial Owners, and each of them, under and in all such oil, gas and mineral leases presently covering and/or bearing against the aforesaid Property, it being the intent of the parties hereto that all rights of Owners and/or Beneficial Owners, and each of them, to receive such rents, royalties and other proceeds hereafter, in the same maimer as such rights to receive said rents, royalties and other proceeds have existed in Owners heretofore, shall be and remain in full force and effect and shall be unaffected in any way whatsoever by the *99 aforesaid transfer made by Owners to Management Corporation.
(k) The parties hereto do further herein and hereby bind and obligate themselves to sign and execute all such division orders and/or other documents and agreements that may be necessary and appropriate to enable Owners and/or Beneficial Owners to receive directly, and without passing through Management Corporation, all rents, royalties, and other proceeds of every nature or kind whatsoever that may become due under and in all such oil, gas and mineral leases that may be hereafter executed, covering and/or bearing against the aforesaid Property, it being the intent of the parties hereto that Owners and/or Beneficial Owners, and each of them, shall have the right to receive, and shall receive, such rents, royalties and other proceeds to become due under oil, gas and other mineral leases that may be hereafter executed, in the same manner as Owners have heretofore received rents, royalties and other proceeds under presently existing leases covering and/or bearing against such Property.
7. It was similarly provided that all revenues and proceeds derived from the administration and management of the property should be credited to the account of Walter, William, and Lydia and be paid to each after deducting all proper costs and expenses, with the obligation on the part of each to replenish the funds for costs and expenses on a proportionate basis from time to time when needed.
8. The minutes of the first meeting of the board of directors of the corporation held on April 15, 1960, show as follows:
A meeting of the Board of Directors of the Harrison Property Management Co. Inc. was held at 507 Decatur Street, New Orleans, La. on April 15,1960. All Directors were present, the President presided and the Secretary recorded the minutes.
Since this was the initial meeting, the President explained that in forming this Corporation nothing was really changed from the partnership, Crescent Commercial Company, which it replaced. This corporation was to be regarded as a management instrument only and all profits and losses were to be handled as though it were in fact a partnership and that it was formed solely to provide for efficient management in the event of the death of one of the Harrisons.
*100 It was decided to provide the Whitney National Bank with a resolution authorizing them to honor checks on the Corporations funds signed by either W. H. Harrison, President, or W. J. Harrison, Secretary-Treasurer.
There being no further business, on motion duly made and seconded, the meeting adjourned.
/s/ Lydia Harrison Couturie Director
/s/ W. J. Harrison Secretary-Treasurer.
/s/ W. H. Harrison Director
Thereafter, through 1963, the minutes reflect the holding of nine meetings of the board of directors with principal reference to authorization for approval of six leases for mineral rights and several rights-of-way, and also such miscellaneous matters as approving a waiver of salaries for corporate officers, authorizing a suit to confirm title to certain land, and authorizing execution of a consent decree to extend the statute of limitations on the corporation’s tax return. The minutes were duly signed by corporate officers.
9. From its original incorporation through December 31, 1963, the corporation’s books and records reflect the following receipts and disbursements:

weo mi mu ms

Receipts $83, 217. 39 $151, 916. 87 $116, 086. 27 $30, 396. 90
Disbursements 75,014.60 144,327.60 116,723.75 40,335.87
The receipts included cash contributions from shareholders, payments for leases of mineral rights and rights-of-way, proceeds from building demolition, proceeds from sale of land, camp rentals, and proceeds from sale of pecans. Payments for leases of mineral rights and rights-of-way were by far the dominant source of revenue. Disbursements included salaries for corporate officers, disbursements to shareholders, taxes, costs of litigation and professional services, supplies, travel expense, utilities, building maintenance costs, commissions, insurance premiums, land care expense, charitable contributions, petty cash, and miscellaneous. During 1960 Walter J. Harrison and William H. Harrison each received $3,200 from the corporation as wages subject to the Federal Insurance Contributions Act (F.I.C.A.).
*101 10. The corporation handled the property transferred to it in accordance with the Articles of Incorporation and the agreement referred to in finding 6. It held meetings of stockholders and directors to authorize action by its officers, executed leases, engaged in litigation, maintained a checking account, paid local taxes, and recorded all of its receipts and disbursements on its books and records.
11. Certain suits involving the Harrison lands, commenced prior to April 14, 1960, the date the taxpayer was formed, resulted in judgments in favor of Walter, William and Lydia. In suits commenced after April 14, 1960, the taxpayer was a party together with Walter, William and Lydia. Some of the mineral leases were executed by the taxpayer alone and some were signed by the taxpayer and Walter, William and Lydia individually.
12. The taxpayer’s financial records were handled as if it were a partnership in that (a) the amounts collected by Harrison Property Management Co., Inc., from time to time, were not recorded as corporate income but were actually credited to Walter, William and Lydia, in equal proportions, (b) the expenses were likewise charged to the same three parties and (c) the corporation maintained capital accounts in the names of its said three true owners in the same manner as the partnership (Crescent Commercial Company), former manager of the property, had maintained its accounts. The corporation accounts reflected the individuals as joint owners of the properties whose legal titles they had transferred to the corporation.
13. Taxpayer maintained a checking account at the Whitney National Bank of New Orleans for the duration of the 1960-63 period.
14. For the period ending December 31, 1960, taxpayer filed a United States Fiduciary Income Tax Betum, on Form 1041, showing gross income of $23,823.77, with deductions of $11,846-39, with the net income of $11,977.68 distributed on an equally proportionate basis to Walter, William and Lydia.
15. For each of the calendar years 1961, 1962 and 1963, taxpayer filed a United States Corporation Income Tax Be-turn, on Form 1120, each said return showing no income or expenses; but each said return included a schedule showing *102 expenses incurred under the management agreement and that the same were paid in equal proportions by Walter, William, and Lydia.
16. For each of the calendar years 1960, 1961, 1962 and 1963, respectively, Walter <7. Harrison and his wife filed United States Individual Income Tax Ketums, on Form 1040, in which they reported the income and expenses allocated t'o them in the several above-mentioned returns that had been filed in the same calendar years by Harrison Property Management Co., Inc.
17. Similarly, William H. Harrison, and his wife, filed United States Individual Income Tax Returns for each of the calendar years 1960,1961, 1962 and 1963, on Form 1040, in which they reported the income and expenses allocated to them in the several above-mentioned returns that had been filed in the same calendar years by Harrison Property Management Co., Inc.
18. Similarly, for each of the calendar years 1960, 1961 and 1962, respectively, Mrs. Lydia Harrison Couturie (Ryan) and her husband, Henry W. Couturie, filed United States Individual Income Tax Returns, on Form 1040, in which they reported the income and expenses allocated to them in the same calendar years by Plarrison Property Management Co., Inc., and Mrs. Lydia Harrison Couturie (Ryan) filed a similar return for 1963, following her divorce from Henry W. Couturie.
19. Walter, William, and Lydia and their respective spouses, paid Federal income taxes on their respective net taxable incomes as shown by the above-mentioned returns.
20. Timely assessments of principal tax and interest were made by the Internal Revenue Service on February 9,1968, against the taxpayer in the following amounts for the indicated years:

Corporate Income F.I.C.A.

Tax Penalty Interest Tax Tax Total

I960 $3, 406. 44 $1, 398. 32 $4, 804. 76
$384. 00 $96.00 167.33 647. 33
1961 39, 166. 06 13, 723. 93 52, 879. 99
1962 22, 604. 71 6, 566. 41 29, 171. 22
1963 21, 763. 49 5, 016. 33 26, 774. 82
TOTAL $114, 283. 12
*103 The total assessment was paid on an equally proportionate basis by Walter, William, and Lydia.
21. Timely claims for refund were filed on January 15, 1969, disallowed on March 28, 1969, and this suit was commenced on June 16,1969.
22. From and after April 14, 1960, one or more portions of the Harrison lands were made subject to one or more oil, gas and mineral leases and/or rights-of-way grants, as referred to in finding 8.
(a) Each said lease and right-of-way grant was negotiated by Walter and/or William.
(b) In some instances the oil, gas and mineral leases were signed by Harrison Property Management Co., Inc., and Walter, William, and Lydia.
(c) In other instances such leases were signed only by Harrison Property Management Co., Inc., acting through William as its President.
(d) However, even where a mineral lease was made solely in the name of Harrison Property Management Co., Inc., as lessor, the agreed consideration therefor was (i) either received by Harrison Property Management Co., Inc., and promptly distributed to Walter, William, and Lydia, or (ii) said consideration was paid directly to said three individual parties.
(e) At times when action was necessary to protect title to or the right of possession of one or more portions of the Harrison lands, Walter, William, and Lydia joined Harrison Property Management Co., Inc., in taking formal legal action.
(f) Proceeds from the sale of the production from the Harrison lands were the subject of one or more Concursus Proceedings before the 17th Judicial District Court for the Parish of Lafourche, State of Louisiana, which were filed prior to April 14, 1960. Despite the transfer on April 14, 1960, these proceeds were directly awarded to Walter, William, and Lydia.
23. The lease dated May 15,1964, from Harrison Property Management Co., Inc., Walter, William, and Lydia in favor of Associated Oil and Gas Exploration, Inc., was originally drawn solely in the name of Harrison Property Management *104 Co., Inc. However, the lessee’s legal counsel refused to accept a mineral lease signed solely by Harrison Property Management Co., Inc., and demanded that Walter, William and Lydia join in the execution of the said lease.
24. The handling of the expenses that accrued, from time to time, from the acts and actions of Harrison Property Management Co., Inc., in the handling and administration of the property was entirely consistent with the agreement dated April 14, 1960. Thus, Walter, William, and Lydia contributed an initial $15,000 to the corporation at the inception of its organization and the expenses were then recorded in the cash journal as they accrued and, whenever additional expense money was required, Walter, William, and Lydia were called upon to contribute and they did so contribute whatever amounts were needed, on the basis of one-third each.
25. Harrison Property Management Co., Inc., never made any loans to anyone or borrowed any funds from anyone, including particularly Walter, William, and Lydia.
26. Recovery is sought of the following amounts of income tax, PICA tax, interest and penalties:
(a) For the calendar year 1960:
Income Tax $3,406.44
Interest 1,398.32
FICA Tax 384.00
Penalty 96.00
Interest 167.33
(b) For the calendar year 1961:
Income Tax 39,156.06
Interest 13,723.93
(c) For the calendar year 1962:
Income Tax 22,604.71
Interest 6,566.51
(d) For the calendar year 1963:
Income Tax 21, 763.49
Interest 5,016.33
$114,283.12
together with interest thereon as provided by law.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made part of the judgment herein, the court concludes as a matter of *105 law that plaintiffs are not entitled to recover and the petition is dismissed.

We borrow our statement of facts from the opinion of Trial Commissioner C. Murray Bernhardt but we come to the opposite conclusion on the principal question.

 There Is a dispute whether the corporation had valid record title, under the peculiarities of Louisiana law, to the property transferred to it. We are not impressed with plaintiffs’ state law argument that it did not — a current contention which is at war with the consistent conduct of the company’s business on the understanding that it did have record title (including a statement to that effect in the side agreement between the company and its owners). Furthermore, in Carver v. United States, supra, 188 Ct. Cl. at 210-11, 212-13, 412 F. 2d at 238, 239, this court expressly held taxable a corporation which was assumed not to have legal or equitable title, under the intricacies of state law, to the property transferred to it by its stockholders. See also National Carbide Corp. v. Commissioner, supra, 336 U.S. at 434-35, 438.

 Plaintiffs seem to argue that when the Supreme Court said, “If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal”, the Court implied that the formal existence of a bare “agency agreement” would show ipso facto that these relations were not, and could not be, “dependent” upon ownership (as they (footnote cont’d)
*88 would be in the absence of some paper contract), but rather upon the technical wording of the agreement (regardless of its content and operation). The whole of the last section of the National Carbide opinion, 336 U.S. at 437 — 39, with its analysis of the “agency agreement” in that case, refutes this semantic suggestion.

 In addition, it is noteworthy that the agreement between the company and the owners does not even make clear that the conventional incidents of agency were intended to be created. For instance, it is far from plain whether the corporation purported to bind the individual Harrisons in leasing, etc.; the contract does not so state explicitly and its terms do not implicitly require that result. (Some of the leases were signed by the company alone and some by both the company and the Harrisons.) Also, the plaintiffs argue that the contract waived the individuals’ limited liability, but we agree with defendant that all that was provided was that the Harrisons would be chargeable for costs and expenses before receiving distributions; nothing was said as to liability to outsiders. These and like factors are not dispositive considerations, one way or the other, but National Carbide suggests that they are relevant. On the whole, as our text indicates, we are satisfied that a “true agency” relationship, under the National Carbide standards, was not established.

 Proposals have been made to remove the particular limitation, but they have not yet been adopted.