**ELOT H. RAFFETY FARMS, INC.,**
**Plaintiff-Appellee,**

v.

**UNITED STATES of America,**
**Defendant-Appellant.**

**No. 74–1392.**

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 15, 1974.

Decided Feb. 26, 1975.

Rehearing and Rehearing En Banc
Denied March 20, 1975.

William S. Estabrook, III, Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellant.

James E. Reeves, Caruthersville, Mo., for plaintiff-appellee.

Before GIBSON, Chief Judge, CLARK, Associate Justice, Retired,* and HEANEY, Circuit Judge.

Mr. Justice CLARK.

This appeal involves a claim for refund of $44,553.35 in federal income taxes paid by Elot H. Raffety Farms, Inc., a Missouri corporation, in the taxable years ending March 31 of 1964, 1967, 1968, 1969, and 1970. The United States District Court for the Eastern District of Missouri granted recovery. We reverse.

From the record, it appears that in early 1965 taxpayer, through its president and principal stockholder (Elot Raffety), agreed orally with L. D. Joslyn, a Missouri attorney, and the Rolwing-Moxley Company (the "Missouri partners") to conduct cotton farming operations in the Republic of Mexico. They agreed that Raffety Farms would own a one-half interest in the enterprise and each of the other partners would own a one-quarter interest. Elot Raffety himself would act as the manager.

When it was discovered that Mexican law effectively prohibits farm operations by foreign nationals, attorney Joslyn employed Mexican counsel and instructed him to take whatever steps were necessary to enable them to farm there legally. Shortly thereafter, the Mexican lawyer organized *El Sombrero Sociedad de Responsibilidad Limitada* to conduct the farming business. Under its charter, *El Sombrero* was authorized to lease land to process cotton, and in general to do all lawful acts related to an agricultural business. The business capital was fixed at 3,000,000 pesos to be provided by three Mexican organizers; the number of members of the company was limited to twenty-five; and the business was to be conducted by an administrator, Luis Vargas Nunez. No conveyance or assignment of any interest in *El Sombrero* was ever made to the taxpayer, nor did *El Sombrero* in fact ever issue any stock. The three Mexicans whose names appeared in *El Sombrero's* articles of organization never contributed any capital to the business, nor did they perform any services for which they were paid by the taxpayer.

During the taxable years in question, taxpayer and the Missouri partners put up substantial sums of money towards the cost of operations of *El Sombrero*. Taxpayer advanced $200,000 in 1966 and an additional $22,000 in 1967; Joslyn and Rolwing-Moxley matched those amounts. In exchange, however, no notes were issued by *El Sombrero;* there was no provision for interest; and no interest was paid. No security was established for the money so advanced. There was no fixed maturity date for repayment; indeed, no money so advanced was even required to be repaid, and none was repaid.

In the summer of 1965, Luis Vargas Nunez, acting in his capacity as administrator for *El Sombrero*, executed some 30 leases for farming land on the east coast of Mexico near Tampico, totalling thousands of acres. A few months later, in April of 1966, Raffety moved to Mexico and commenced operations. In the name of *El Sombrero*, he opened and maintained bank accounts, contracted for goods and services, and borrowed almost half a million dollars from Cook & Company, signing the promissory notes on *El*

*Sombrero's* behalf. From the first, however, adverse fortune plagued the business.

Approximately 7,300 acres of cotton had been planted and had come up when Hurricane Inez struck in the first week of October, 1966, leaving less than 600 bales of cotton harvestable. The next year, after an initial dry season, crops were just coming up when Hurricane Beulah hit, drowning the cotton and making the acreage impossible to cultivate. Turning to safflower as a wintertime stopgap, Raffety planted that crop in November and December of 1967, but by the time it was harvested in the Spring of 1968, financial difficulties had caught up to *El Sombrero,* forcing the company to cease operations. Since payments on the Cook & Company loans were overdue, that creditor sued in Mexican court and obtained a judgment for $95,052.78 against *El Sombrero* as an organizational entity.[1] At the trial both Raffety and Senor Nunez appeared on behalf of *El Sombrero.*

Taxpayer never recovered its original advances to *El Sombrero.* Subsequently a complaint was filed in federal district court seeking a refund on income taxes paid between 1964 and 1970, and contending, alternatively, that the losses were deductible from income as:

(1) operating losses under 26 U.S.C. § 165(a);

(2) bad debt losses under 26 U.S.C. § 166(a)(1); or

(3) ordinary business expenses under 26 U.S.C. § 162(a).

In response the Government argued that the advances were simply contributions to the capital of an "association" taxable as a corporation and must be characterized as capital losses under 26 U.S.C. § 165(f).

In a memorandum decision, D.C.Mo., 369 F.Supp. 653, filed December 27, 1973, the district court found as follows:

Although this *S. de R. L.* is an association taxable as a corporation under the Code, the Court is of the opinion that it must be disregarded for tax purposes as it was but a passive entity.

\* \* \* \* \* \*

The *El Sombrero S. de R. L.* was not organized for the purpose of avoiding taxes. Rather, it was organized upon the advice of Mexican legal counsel to allow the Missouri partners to farm in Mexico without being in violation of Mexican law. However, the *S. de R. L.* performed no substantial business function.

The court drew attention to the taxpayer's regular business of farming in Missouri and concluded that the Mexican cotton-growing operation was no more than an extension of its existing business. The lost advances were therefore ordinary and necessary expenses, deductible under 26 U.S.C. § 162(a). We cannot agree with the trial court.

The district court correctly classified *El Sombrero* as a corporate entity, i. e., an "association" under the Code. The relevant rule is that:

An unincorporated organization shall not be classified as an association unless such organization has more corporate characteristics than noncorporate characteristics. [Treas.Reg. § 301.-7701–2(a)(3).]

The key factors to be considered are continuity of life, centralization of management, liability for corporate debts limited to corporate property, and free transferability of interests. Treas.Reg. § 301.7701–2(a).

Under Mexican law, it is clear that *El Sombrero* did have more corporate characteristics than non-corporate ones. Its liability was limited to its capital; its management was centrally controlled in the hands of an administrator; its life was continuous for at least 20 years, without limitation by death or separation of any of the members; it was required

---

1. Having guaranteed payment of the notes for *El Sombrero,* Raffety was made a party to the litigation, and his private airplane was temporarily seized when Cook & Company levied on the company's assets. It was apparently returned subsequently.

to have an annual meeting and an annual accounting; the fiscal year was the calendar one; the liquidation of the corporation was to be handled by the manager or other person designated by the members; and there could be only 25 members. Although the members of *El Sombrero* did not formally enjoy the right of free transferability of interests, the organization must be treated as a corporate entity since it possessed the remaining characteristics. Nevertheless, as we noted above, the district court chose to disregard *El Sombrero's* legal form and to focus on its "passive" nature. We think this puts the shoe on the wrong foot.

 Since any income tax deduction is a matter of legislative grace, the claimant bears the burden of proving that he comes within its provisions. Interstate Transit Lines v. Commissioner, 319 U.S. 590, 593, 63 S.Ct. 1279, 87 L.Ed. 1607 (1943). In the business area, once a corporate entity has been identified, it may not be disregarded in respect to taxation if it was intended to "have some real substantial business function, or if it actually engages in business." Jackson v. Commissioner, 233 F.2d 289, 290 (2d Cir. 1956). Here, *El Sombrero* did have an intended purpose and did engage in business. Indeed, it was the *sine qua non* of the Missouri group's being permitted to farm in Mexico. Without it, not one acre of land could have been leased, not one dollar borrowed, not one field plowed, nor one seed planted. It was the business entity through which the entire enterprise functioned and in whose name its operations were performed. As the Supreme Court has stated in Moline Properties v. Commissioner, 319 U.S. 436, 438, 63 S.Ct. 1132, 1134, 87 L.Ed. 1499 (1943):

> The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be *to gain an advantage under the law of the state of incorporation* or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. [Emphasis added]

*Cf.* Omaha Public Power District v. O'Malley, 216 F.2d 764 (8th Cir. 1954).

In its brief, taxpayer argues that *El Sombrero* was "a fictional farce" that conducted no business operations itself. In particular, appellant stresses that Nunez, the so-called "administrator" of *El Sombrero*, had absolutely nothing to do with the operation of the business in Mexico. Taxpayer states:

> Luis Vargas Nunez did not handle the business of *El Sombrero*. There was no accounting or administration made annually and when the business was liquidated in 1968, it was not carried out by Mr. Nunez. Nunez had nothing to do with the management of the farming business and the three Missouri partners had equal voice and control in the management of the partnership affairs.

The bald facts of the record are to the contrary.

*El Sombrero* obtained and signed, through its administrator Nunez, leases on the 7,300 acres of land on which it conducted farming operations in Mexico; it received and paid out the funds (including those paid in by Raffety Farms and now claimed as deductions) used in the Mexican operation; it contracted for goods and services, bought machinery, and created a line of credit; it negotiated loans; and, finally, when the end came, it suffered a suit by Cook & Company in the Mexican courts in which administrator Nunez appeared for the company. While it is true that Elot Raffety personally supervised the actual farming, the entire operation was conducted in *El Sombrero's* name.[2]

---

2. The documents in this case make unmistakably clear that the parties perceived *El Sombrero* as a separate entity. For example, on May 17, 1967, attorney Joslyn (one of the

■ The record disproves that *El Sombrero* was, as taxpayer insists, "a sham and a dummy organization" created for the purpose of evading Mexican law. On the contrary, it emerges as a viable, commercially active company operating on a million-dollar scale in Mexico which afforded to its true owners complete protection from personal liability. Taxpayer may not escape liability in a foreign nation's courts under one theory and then seek an advantage in this nation's courts by contending its opposite. That *El Sombrero* may not have been operated in complete accord with Mexican law or its charter is, at this late date, an irrelevancy.[3]

■ Alternatively, taxpayer urges that *El Sombrero* be viewed as, at most, an agent or nominee for the Missouri partners and that the losses are therefore attributable to the latter. We must reject this contention, for nothing in the record suggests that *El Sombrero* acted in the name of Raffety Farms, Joslyn, or Rolwing-Moxley in the conduct of its affairs with third parties. *See* Harrison Property Management Co., Inc. v. United States, 475 F.2d 623, 201 Ct.Cl. 77 (1973).

■ Since the entity status of *El Sombrero* must be recognized, appellant's three claimed bases for deductions must accordingly be rejected. Raffety Farms paid the $222,000 at issue into the Mexican venture as a start-up expense and received a pure equity interest in *El Sombrero* proportionate to that contribution; no intent to repay or other indicia of a loan existed. Unquestionably, this capital investment may not be characterized as a "debt" under the bad debt loss provision of 26 U.S.C. § 166(a)(1). Further, we cannot accept the claim that *El Sombrero* was a mere extension of taxpayer's on-going farming activities in Missouri; it had no relationship with Raffety Farms' other agricultural operations. *El Sombrero* was a separate and distinct enterprise operating in a foreign country and in conjunction with other parties. Its expenditures for labor, equipment, and leases cannot be characterized as taxpayer's ordinary and necessary business expenses under 26 U.S.C. § 162(a). Hagan v. United States, 221 F.Supp. 248 (W.D.Ark.1963), and Lutz v. Commissioner, 282 F.2d 614 (5th Cir. 1960), on which appellant relies, are therefore inapposite. The losses sustained by the Mexican operation are *El Sombrero's* alone, and, since taxpayer's interest in that company was a capital asset, may be deducted under 26 U.S.C. § 165 only to the extent allowed in §§ 1211–1212. *See* 26 U.S.C. § 165(f).

The judgment is reversed.

GIBSON, Chief Judge (dissenting).

I respectfully dissent. While this case presents a close question, to me the Mexican entity, *El Sombrero,* was not a cor-

Missouri partners) wrote to one John Baldridge of Tampico, Mexico, regarding acquisition of land by the company, saying:

Sombrero has continued to prepare this farmland since its first oral agreement was reached in Tampico and has expended much money, time and effort thereon.

Moreover, the contract for establishing credit with Cook & Company, signed by Luis Vargas Nunez, as administrator of *El Sombrero,* and Elot Raffety, as guarantor, specifically designated *El Sombrero* as "The Grower", not Mr. Raffety. The tenth paragraph of this document obligated the grower "to continue delivering to the company [Cook] . . . the crops and fruits". And the eleventh paragraph obligated the grower "to sell to the company . . . the entire cotton crop . . . .". Furthermore, by letter to Cook & Company on September 17, 1968, Elot Raffety himself, representing El Sombrero, requested "a full accounting of the relationship between *El Sombrero* and your Company" and notes that Cook has in its possession "a good bit of our machinery and undoubtedly have sold some of it but we have had no word as to either the detailed account or credits on it . . . ." Significantly, the letter closes with the observation that "Mr. Joslyn wrote you asking for an accounting and he says he has heard nothing." The letter is signed "*Sombrero S. de R. L.*" on the typewriter and below it appears the name of "Elot Raffety".

3. So too, it is unavailing to appellant that the Missouri partners believed that they were only forming a limited partnership. The status of a taxpayer is determined not by what the taxpayer thought, but by the terms of the instrument which created it. Wholesalers Adjustment Co. v. Commissioner, 88 F.2d 156 (8th Cir. 1937).

poration and should not be treated as a corporation for tax purposes because it served no business function other than to enable the taxpayer to operate in Mexico. The taxpayer and its associates sought to carry on a profit-making venture as a partnership [1] and were advised by Mexican counsel that formal creation of a "limited liability company" would be legally required for conducting business in Mexico. Even after counsel created the entity, however, it was operated as a partnership in every respect. The sole purpose of the Mexican entity was to provide an assumed name to enable the Missouri partnership to operate lawfully in Mexico. Tax avoidance played no part in the taxpayer's decision to create it.

The majority's decision in this case is another application of an anomalous principle under which the taxpayer always loses. If the substance of the transaction favors the Government, we look to substance (which we should); if it favors the taxpayer, we ignore it and look to form. It is improper in this case to impute corporate characteristics where there were none so as to deny the claimed operating loss of what was obviously a partnership venture. Whenever taxation is allowed to depend upon form rather than substance, "the door is opened wide to distortions of the tax laws." Landa v. Commissioner, 93 U.S. App.D.C. 265, 269, 211 F.2d 46, 50 (1954). Here, as elsewhere, the decision should turn on substance regardless of the outcome. Estate of Smith v. Commissioner, 313 F.2d 724, 730 (8th Cir. 1963).

I believe the entity as it was actually formulated and used by the partners did not possess sufficient corporate characteristics, even viewed under the Treasury Regulations cited by the majority, to warrant limiting the taxpayer to capital loss deductions by labeling this nebulous entity a corporation. It was in reality no more than a sham. None of the Missouri partners subscribed to the Articles which created the entity; they couldn't even read the Spanish language of the Articles, and were not informed of their specific contents until the IRS provided them a translation. They were issued no stock, notes, assignments, or other conveyance evidencing their interests in the entity. Nor did they receive any assurance of dividends, interest, security or a fixed date for repayment of their advancements of operating funds.

Moreover, none of the Mexican subscribers (fictional owners) made any actual investment in the partnership or Mexican entity and only one participated in its affairs. Indeed, they were practically unknown to the Missouri partners and no money was invested by the partners in their behalf. The figurehead administrator's activities appear to have been limited to signing documents with which he was unfamiliar or uninterested. He did not conduct the 1968 liquidation of the entity as the Articles purported to require. Nor were any required annual meetings conducted or accountings rendered. In sum, the entity was never capitalized or managed according to the provisions of its organizational Articles.

Three of the four characteristics relevant under Treas.Reg. § 301.7701-2

---

1. The "Missouri partnership" was formed in 1965 by oral agreement between three partners:

 (1) the taxpayer, Elot H. Raffety Farms, Inc., a Missouri corporation engaged in farming in Missouri and Illinois, acting through its president and principal stockholder, Mr. Raffety ($\frac{1}{2}$ interest);

 (2) Mr. L. D. Joslyn, a Missouri attorney ($\frac{1}{4}$ interest); and

 (3) Rolwing-Moxley Company, a corporation which Joslyn partly owned, engaged in producing cotton and other farm products ($\frac{1}{4}$ interest).

 The partnership was formed solely for the purpose of conducting farming operations in Mexico. The three partners agreed to share the profits and losses of their Mexican venture in proportion to their interests ($\frac{1}{2}$, $\frac{1}{4}$, and $\frac{1}{4}$ respectively). They considered themselves to be general partners having equal shares in management and control but delegated authority to Mr. Raffety to administer the Mexican operations personally.

 Of the three partners, only the taxpayer corporation, Elot H. Raffety Farms, Inc., is a party to this litigation.

(1960), as amended by T.D. 6797 (1965), if present at all in the Mexican entity, existed in form only. First, while the entity purported to enjoy continuity of life by withstanding death or separation of any of the fictional members, the portion of the Articles treating the subject failed to provide for other contingencies such as bankruptcy or insanity of a member which might otherwise cause dissolution of a partnership. And, of course, the investing Missouri partners themselves were in no way affected by the entity's Articles. They had no documented legal interest nor association with it and their partnership did not enjoy continuity of life. *See* Uniform Partnership Law, Mo.Rev.Stat. § 358.310 (1969, V.A.M.S.).

Second, while the general partners formally appeared to enjoy limited liability shielded by the Mexican entity, they all in fact did not. Because of the entity's obvious fictional nature, the partners were apparently unable to borrow sufficient capital under its name alone without adding Mr. Raffety's personal guaranty. As a result, Raffety himself was ultimately held personally liable for some of the venture's debts in litigation in a Mexican court.

The third characteristic, centralized management, was not present because the fictional administrator merely performed ministerial acts as an agent under the direction of his principal, the Missouri partnership. Treas.Reg. § 301.-7701–2(c)(3) and (4). Although the Articles purported to empower the administrator to transact any of the entity's business, in fact he had no authority to make business decisions on its behalf independent of the Missouri partners. The partners agreed from the start that they alone would share management and control of the venture equally with the understanding that Mr. Raffety would conduct the business and farming operations personally in Mexico, using the entity's name rather than his own. And while the entity itself extended no actual authority to Raffety to act on its behalf, the Missouri partnership surely did. As

an example, Raffety personally drew all checks in the entity's name to pay the venture's farming expenses.

The final corporate characteristic, free transferability of interests, was present neither in form nor in substance. No shares of stock or any other evidence of equity ownership was ever issued to the Missouri partners or their nominees. The Government conceded that the interests of even the fictional owners of the Mexican entity were not freely transferable because the Articles contained restrictions. And if in reality the Missouri partners' interests in the entity were none other than their partnership interests, transfer of the interests was restricted under Missouri law. *See* Uniform Partnership Law, Mo.Rev.Stat. § 358.270 (1969). It thus appears that the association of *El Sombrero* had more noncorporate characteristics than corporate characteristics and should under Treas.Reg. § 301.7701–2 be characterized as a noncorporate entity.

It further appears that even if the concept of a taxable association is stretched to include the Mexican entity in this case, the District Court correctly concluded that the entity should be disregarded for tax purposes because it was altogether passive. While the practice of disregarding a corporate entity is not to be lightly applied in any context, this case presents the proper exceptional situation that warrants it.

The entity here performed no substantial business function and actually engaged in no business. Its purpose, as the District Court found, was solely to allow the Missouri partners to farm in Mexico without violating Mexican law. Such a purpose cannot be considered the equivalent of commercial or "business activity" as that term is used in Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 438–39, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943), because it is inert. Moreover, following its organization the entity did not itself carry on any business. Raffety's personal Mexican farming activities on behalf of the partnership, with no more connection to the entity than the use of

its name, cannot be characterized as conduct of business by the entity. The test of conducting business under Jackson v. Commissioner, 233 F.2d 289, 290–91 (2d Cir. 1956), is the actual business functioning of the entity itself, if any, not the taxpayer's aim to be accomplished by using it. The entity here should thus be disregarded for tax purposes just as it was for all others, and the partners' operating loss recognized as their own, not merely as that of the Mexican entity. *See* Paymer v. Commissioner, 150 F.2d 334, 337 (2d Cir. 1945).

I would affirm the judgment of the District Court for the reasons stated by Judge Wangelin and would further hold that the Mexican entity was not an association taxable as a corporation.